Lynn Paul **GRABOSKY**, Plaintiff,

v.

**TAMMAC CORPORATION**, Defendant.

No. 3:CV–99–0028.

United States District Court,
M.D. Pennsylvania.

Dec. 22, 2000.

Ralph J. Johnston, Johnston and Johnston, Kingston, PA, Joseph T. Wright, Wright and Associates, Scranton, PA, for Plaintiff.

Cynthia R. Vullo, Koff, Wendolowski, Ferguson and Mangan, P.C., Wilkes–Barr, PA, for Defendant.

## *MEMORANDUM*

VANASKIE, Chief Judge.

Lynn Paul Grabosky filed this action against defendant Tammac Corporation ("Tammac"), alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955(a). Mr. Grabosky contends that he was fired by Tammac because of his age (45) and medical condition (history of heart attack). While conceding that he is not disabled, Mr. Grabosky asserts that Tammac fired him because its decision-makers regarded his cardiac problem as substantially limiting his ability to work.

Tammac has moved for summary judgment, alleging that Grabosky cannot establish a *prima facie* case under the ADEA or the ADA, and cannot establish that Tammac's alleged nondiscriminatory reasons for Grabosky's discharge were pretextual. Tammac also contends that it is entitled to summary judgment on the PHRA claim because the PHRA claim was filed untimely. Finally, Tammac seeks to restrict the types of damages that may be recoverable in this case and to preclude a jury trial on the PHRA case.

Because Grabosky has failed to present evidence sufficient to create an inference that Tammac perceived him as disabled, and thus cannot establish a *prima facie* case of disability discrimination, summary judgment will be granted on plaintiff's ADA claim.[1] Because Grabosky has presented sufficient evidence to create an inference that his discharge was due to his age, summary judgment will be denied as to the ADEA claim. Because there are issues of fact as to whether the PHRA age discrimination claim was filed timely, summary judgment will be denied as to that claim. Finally, plaintiff is entitled to a jury trial in federal court on his PHRA claim.[2]

## *BACKGROUND*

Lynn Grabosky was hired by the defendant in 1985 to work as an adjuster/collector in Tammac's manufactured housing division. (Def.'s Stat. of Material Facts, Dkt. Entry 24, at ¶ 11–12.)[3] During the

---

1. Because Grabosky's PHRA claim based on disability is to be decided on the basis of the same standards governing his ADA claim, *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996), Tammac is entitled to summary judgment on that claim.

2. Grabosky has conceded that he is not entitled to compensatory damages under the ADEA, and that he is not entitled to punitive damages under either the ADEA or the PHRA.

3. Pursuant to Local Rule 56.1, Tammac accompanied its summary judgment motion with a statement of material facts that it claimed were not subject to genuine dispute. Grabosky responded, admitting a number of Tammac's factual assertions, qualifying his admissions to others, indicating a lack of knowledge as to a few others, and denying the remainder of Tammac's assertions. Both parties cited to the parts of the factual record they claimed supported their assertions. As to those facts admitted by Grabosky, the perti-

pertinent time period, Tammac's manufactured housing division included four sales territories in Pennsylvania—northeastern, southeastern, central and western. (*Id.* at ¶ 21.) Each sales territory had an assigned sales representative, and, depending on the amount of collection work, an assigned field collector.[4] (*Id.* at ¶ 22.) Prior to 1995, Grabosky was assigned as a field collector for the northeastern Pennsylvania territory.[5] (*Id.* at ¶ 24.) The sales representative with whom Grabosky worked in northeastern Pennsylvania was James Steinkirchner. (*Id.* at ¶ 25.)[6]

As a collector, Grabosky's duties included visiting delinquent accounts for collection, assisting with repossessions and performing floor plan checks.[7] (*Id.* at ¶ 29.) Tammac's collection work arose out of contracts which Tammac had with various banks. (*Id.* at ¶ 30.) Pursuant to those contracts, Tammac sales representatives would solicit the manufactured housing dealers in their territory for the purpose of selling the bank's financial programs. (*Id.*) For any loans placed with the bank, Tammac would perform collection work if the loans became delinquent. (*Id.*) Grabosky handled collections for several financial institutions, including First Eastern Bank and Commonwealth Bank. (*Id.* at ¶ 31, ¶ 37.)

During 1993–1994, both First Eastern Bank and Commonwealth Bank withdrew their collections accounts from Tammac. (Grabosky Dep. at 54–55; Romanowski Aff., ¶ 4.)[8] At the time the contract was terminated, First Eastern Bank had approximately 3000 outstanding accounts for which Tammac had collection responsibilities. Many of those accounts were handled by Grabosky. From 1989 to 1996, there was also a general decline in the amount of loans generated by the sales representatives. (Steinkirchner Affidavit at ¶ 14.)

In August of 1994, Grabosky suffered a heart attack and was hospitalized for three

---

nent paragraphs of Tammac's statement of material facts will be cited in this Memorandum opinion. As to all other facts set forth in this decision, the pertinent part of the underlying record will be cited.

4. Tammac employs both inside and outside (or field) collectors. The inside collectors work out of Tammac's client banks and perform primarily telephone work. Outside (or field) collectors' primary responsibilities include door-to-door collection work, although they often perform inside collection work as well. (Steinkirchner Aff. at ¶ 4.) Grabosky was considered a field collector.

5. Until 1996, the northeastern Pennsylvania sales territory extended north to Waverly, New York, east to the New Jersey border, south to approximately Reading, Pennsylvania, and west to Williamsport, Pennsylvania. (Def.'s Stat. of Material Facts, Dkt. Entry 24 at ¶ 27.)

6. Although Grabosky reported directly to Steinkirchner (Grabosky Dep., Dkt. Entry 26 at 37–38; Steinkirchner Aff., Exh. R to Pl.'s Appendix of Exhibits, Dkt. Entry 36 at ¶ 3), Don Brown coordinated the activities of the outside collectors from 1991–1993. (Brown Dep., Dkt. Entry 29, at 13–16; Poth Dep., Dkt. Entry 27 at 19–20.) Robert Fallon was hired in 1995 as the collections manager. (Def.'s Stat. of Material Facts at ¶ 97.) Fallon reported to Jeffrey Poth, the Vice President of marketing in the manufactured housing division, who had supervisory responsibility over the collection work. (Poth Dep. at 18.) Poth reported to William Smith, who became Tammac's President in August of 1995. (Smith Dep., Dkt. Entry 28 at 4, 21.) At the time of Grabosky's termination, Poth was 40 years old and Smith was 42 years old.

7. Floor plan checks involved inspecting the financed inventory of manufactured housing units once a month to insure that all units were present at the dealer's lot and that they contained the appropriate appliances, furniture, etc. (Def.'s Stat. of Material Facts, Dkt. Entry 24 at ¶ 44.) Grabosky also performed other duties at Tammac, including working in the equipment leasing program, buying property for the company and working as an inside collector for First Eastern Bank, Commonwealth Bank, First Bank of Troy, and On Bank. (Grabosky Dep. at 13–22, 51; Steinkirchner Aff. at ¶ 4.)

8. Commonwealth Bank was bought by Meridian Bank. (Def.'s Stat. of Material Facts at ¶ 38.) Although there was still collection work to be done, the amount of collection work did eventually decline.

days. (Def.'s Stat. of Material Facts at ¶ 84.) After his release from the hospital, Grabosky returned to work in his regular position and without any limitations or restrictions. (*Id.* at ¶ 86.) Grabosky did not miss any other days of work because of his heart condition. (*Id.* at ¶ 87.)

On July 24, 1995, Todd Wolever, the adjuster for Tammac's southeastern Pennsylvania territory, resigned. (*Id.* ¶ 49.) Some time after Wolever left and after William Smith became Tammac's President in August of 1995, Grabosky was assigned additional responsibilities for collection work and floor plan checks in the southeastern Pennsylvania territory.[9] (Grabosky Dep. at 85–86; Fallon Aff., Exh. R of Pl's Exhs., Dkt. Entry 36 at ¶ 5.) Since Grabosky resides in northeastern Pennsylvania, the addition of this new territory required him to travel more extensively to perform collection calls and floor plan checks. (Fallon Aff. of March 20, 2000, Exh. F of Def.'s Exhibits in Reply, Dkt. Entry 40 at ¶ 7.) Grabosky asserts that after Smith became president his work became more heavily scrutinized than the other collectors. (Grabosky Dep. at 81–84.) At Grabosky's evaluation in 1995, Poth suggested that Grabosky spend nights on the road in order to improve his efficiency.[10] (Poth Dep. at 128, 131; Grabosky Dep. at 93.) Grabosky, however, never spent a night on the road, and he asserts that it was unnecessary for him to stay overnight in order for him to adequately perform his job. (Grabosky Dep. at 90–93.)

On February 19, 1996, Poth and Smith advised Grabosky that there was a lack of work and that he was being laid off without chance of recall. (Def.'s Statement of Material Fact at ¶ 57; Grabosky Dep. at 96–97.) Grabosky claims, however, that he was also told that there remained a possibility of a recall. (*Id.* at 100–102.) It is undisputed that he was allowed to keep his company car. It is also undisputed that Grabosky was, in fact, brought back to work temporarily in April of 1996.

At the time of his discharge, Grabosky was 45 years old. He had been employed by Tammac for approximately 11 years.

Tammac claims that it fired Grabosky because collection work in the northeastern territory had declined and it would be better served by a collector who lived closer to its southeastern territory. In April 1996, Tammac hired Bob Popalis to work as a field collector in the southeastern and northeastern Pennsylvania territories. (Popalis Aff., ¶ 1.) Popalis was 55 years old, and lived in Zion Grove, Pennsylvania, which is 45 miles closer to the southeastern territory than Taylor, Pennsylvania, the town where Grabosky resided. (Popalis Aff., Dkt. Entry 14 at ¶¶ 2, 3.) Popalis was primarily responsible for collection work in the southeastern Pennsylvania territory; however, he also assumed Grabosky's prior accounts in northeastern Pennsylvania. (*Id.* at ¶ 6.) Since Grabosky's termination, Popalis has been the only field collector to cover both the southeastern and northeastern Pennsylvania territories. (*Id.* at ¶ 8; Poth Dep. at 89–90.)

Grabosky filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") on September 6, 1996, more than 180 days after he was fired, but less than 100 days after his April, 1996 recall. Grabosky asserts that he did not learn until late August 1996 that he had been replaced.[11]

---

9. Prior to 1996, the southeastern Pennsylvania territory extended north to Reading, east to Philadelphia, south to northeast Maryland and west to Chambersburg, Pennsylvania. (Def.'s Stat. of Material Facts at ¶ 28.)

10. From November 1995 to February 1996, four of the locations where Grabosky performed floor plan checks were located in southeastern Pennsylvania. (Def.'s Statement of Material Facts at ¶ 48.) Two other dealers were located in the southern part of the northeast territory (*Id.*)

11. The PHRC denied Tammac's motion to dismiss the PHRA claim as untimely, finding that there was a genuine dispute of facts material to the question of equitable tolling.

This action was filed on January 6, 1999. (Complaint, Dkt. Entry 1.) Grabosky is asserting discrimination claims under the ADA, the ADEA and the PHRA. Now pending is defendant's motion for summary judgment.

## DISCUSSION

### A. Summary Judgment Standards

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 329, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie*, 682 F.2d 436

See April 16, 1997 decision in *Grabosky v. Tammac Corp.*, Dkt. No. E–80159–AH, attached as Ex. N to Plaintiff's Appendix in Opposition to Summary Judgment Motion.

**12.** Claims brought under the PHRA are analyzed under the same standards as their federal counterparts. *See Connors v. Chrysler Fi-*

(3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party, "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Discrimination Claims

Employment discrimination claims under the ADA and the ADEA can be established in one of two ways: (1) by direct evidence that the employer's decision was motivated by discrimination; or (2) by indirect evidence which creates an inference of discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[12] As the Third Circuit Court of Appeals recently explained:

> In indirect evidence cases, the plaintiff must make a prima facie showing of discrimination. If the plaintiff cannot do so, the defendant is entitled to judgment as a matter of law. If the plaintiff does establish a prima facie case, the defendant must produce some evidence of a legitimate, nondiscriminatory reason for the adverse employment action. Once it does so, the burden remains with the

*nancial Corp.*, 160 F.3d 971, 972 (3d Cir. 1998); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996) (Title VII, ADA, ADEA); *Fosburg v. Lehigh University*, No. Civ. A. 98–CV–864, 1999 WL 124458, at *7 (E.D.Pa. March 4, 1999.)

plaintiff to prove by a preponderance of the evidence that the proffered reason was pretextual.... *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 352 n. 4 (3d Cir.1999) (citations omitted). To defeat summary judgment, the plaintiff must proffer evidence "from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Showalter v. Univ. of Pittsburgh Medical Center,* 190 F.3d 231, 235 (3d Cir.1999) (citations omitted); *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (*en banc*); *Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir.1994). "To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show that the employer's decision[s] [were] wrong or mistaken.... Rather the moving plaintiff must demonstrate such weaknesses or implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find them unworthy of credence." *Fuentes v. Perskie,* 32 ·F.3d 759, 765 (3d Cir.1994) (*citing Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 523 (3d Cir. 1992)); *Sylvester v. Unisys Corp.,* No. Civ. A. 97–7488, 1999 WL 167725, at *4 (E.D.Pa. March 25, 1999). The trial court's function on a summary judgment motion is to determine whether plaintiff's evidence is sufficient "to permit a reasonable fact finder to conclude that the [employer's] reasons are incredible." *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1067 (3d Cir.1996) (*en banc*), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997).

### 1. *ADA claim*

■ To establish a prima facie case of discrimination under the ADA, it is incumbent upon Grabosky to present evidence that: (1) he has a "disability" within the meaning of the ADA; (2) he was qualified for his position, with or without accommodation; and (3) he suffered an adverse employment decision as a result of the discrimination. *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir.2000); *Deane v. Pocono Medical Center,* 142 F.3d 138, 142 (3d Cir.1998) (*en banc*).

■ A "disability" is defined by the ADA as:

(A) a ·physical or mental impairment that substantially limits one or more of the major life activities of such individual

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Accordingly to fall within this definition, one must have an actual disability (subsection A), have a record of a disability (subsection B), or be regarded as having one (subsection C)." *Sutton v. United Air Lines Inc.,* 527 U.S. 471, 478, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

A "physical or mental impairment" for purposes of the ADA has been defined to include a "physiological disorder or condition ... affecting one of more of the following systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), [and] cardiovascular...." 29 C.F.R. § 1630.2(h)(1). "Substantially limits" has been defined as, among other things, an inability "to perform a major life activity the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). "Major life activities" include "walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

Grabosky does not contend that his heart condition substantially limits any of life's major activities. Nor does he assert that he has a record of such an impairment, *i.e.*, that he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). What he does claim is that Tammac perceived him to be disabled as a result of his heart condition.

A person is "regarded as" having a disability if that person:

(1) has a physical impairment that does not substantially limit major life activities but is treated by the defendant as substantially limiting a major life activity;

(2) has a physical impairment that substantially limits major life activities only as a result of the attitudes of others towards such impairment; or

(3) has no impairment at all but is nonetheless treated by the defendant as having a substantially limiting impairment. *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3d Cir.1999); 29 C.F.R. § 1630.2(*l*). As Justice O'Connor explained in *Sutton*, 527 U.S. at 489, 119 S.Ct. 2139, the "regarded as disabled" component of the definition of a disability requires that a defendant "entertain misperceptions about the individual—he must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often 'resul[t] from stereotypic assumptions not truly indicative of ... individual ability.'"

In a "regarded as" case, such as this one, the analysis "focuses not on [plaintiff] and his actual abilities, but rather on the reactions and perceptions of the persons interacting or working with him." *Kelly v. Drexel University*, 94 F.3d 102, 108–09 (3d Cir.1996). The test, moreover, is not whether the employer harbored some unsubstantiated bias with respect to the employee's actual or perceived impairment; instead, the question is whether the employer "treated plaintiff adversely because it regarded him as having an impairment that substantially limits one or more major life activities." *Weber v. Strippit, Inc.*, 186 F.3d 907, 915 (8th Cir.1999), *cert. denied*, 528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (2000). "Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment ... are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." *Sutton*, 527 U.S. at 490–91, 119 S.Ct. 2139.

At this stage of this case, it is incumbent upon Grabosky to present some evidence supporting a rational inference that Tammac regarded Grabosky's heart condition as substantially limiting a major life activity. Grabosky suggests that the major life activity that Tammac perceived to be limited by Grabosky's heart condition was "working." "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). In other words, there must be evidence from which it may logically be inferred that Tammac perceived Grabosky's heart condition as significantly restricting his ability "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

Without citing any evidence, Grabosky asserts that "[s]ociety views people with heart conditions and similar disorders as fragile and weak," and that "[t]here is generally a concern that any kind of stress or pressure can trigger a heart attack in someone with a heart condition." (Plf's Br. in Opp. to S.J.Mot. at 5.) In addition to failing to cite any evidence that substantiates the existence of this purported socie-

tal opinion, Grabosky does not cite any evidence that Tammac's decision-makers held such a view.

Thus, this is not a case like *Deane v. Pocono Medical Center*, 142 F.3d 138 (3d Cir.1998), on which Grabosky relies, where there was evidence that the employer had come to the conclusion, albeit erroneous, that a wrist injury substantially limited what the plaintiff could do and a vocational expert explained the import of the erroneous perception insofar as the employability of the employee was concerned. Nor is this the kind of case contemplated in 29 C.F.R. Pt. 1630 app. § 1630.2($l$), indicating that a "regarded as" disabled employee may be a person with hypertension who is reassigned to less strenuous work because of the employer's unsubstantiated fear that the person will suffer a heart attack. There is simply no evidence in this case that Tammac reduced Grabosky's responsibilities or limited his work because of some unsubstantiated concern for his health.

On the contrary, the undisputed evidence is that approximately one year after Grabosky suffered his heart attack his responsibilities and work requirements expanded. The fact that an employer increases an employee's work requirements cannot logically support a rational inference that the employer perceived the employee to be substantially limited in the major life activity of working. *See Penchishen v. Stroh Brewery Co.*, 932 F.Supp. 671, 675 (E.D.Pa.1996) (summary judgment granted on ADA claim where plaintiff given job assignments that required substantial walking notwithstanding her leg injury because such evidence "tends to show that Defendant did not perceive Plaintiff as substantially limited in the activities of walking or working ..."), *aff'd mem.*, 116 F.3d 469 (3d Cir.), *cert. denied*, 522 U.S. 868, 118 S.Ct. 178, 139 L.Ed.2d 119 (1997).

Grabosky attempts to span the gap in the logic of his argument by citing the affidavit of a disgruntled former employee

of Tammac, James Steinkirchner, asserting that "Grabosky was being run ragged in an attempt to force him to resign." (Plf's Br. in Opp. to S.J.Mot. at 7.) This assertion is insufficient to defeat summary judgment, not because Steinkirchner is a former employee who sued Tammac, but because there is no evidentiary component to it. Steinkirchner does not say that he had a discussion with a Tammac decision-maker who revealed a scheme to force Grabosky to resign because the company perceived him unable to work. At his deposition, Steinkirchner conceded that he had no involvement in the decision to discharge Grabosky and did not know the circumstances surrounding his departure. Moreover, when asked to state facts supporting his contention that Tammac discriminated against Grabosky, Steinkirchner merely responded that he was entitled "to think anything that he wants." (Steinkirchner Dep. at 162.) While Steinkirchner may be entitled to his opinion, his speculation as to Tammac's motivations in expanding Grabosky's work responsibilities is not entitled to any evidentiary weight.

Grabosky claims that his work came under more intense scrutiny after Smith became president of Tammac in 1995. He asserts that, in particular, Smith held the view that a person with a history of a heart attack was substantially limited in the major life activity of working. But even assuming that Smith knew of Grabosky's heart condition and directed that Grabosky's work be more closely supervised, it does not follow that he must have perceived Grabosky to be unable to work. Reduced to its essence, this type of assertion would mean that an inference that an employer regarded an employee as disabled could be drawn whenever the employer was aware of a physical or mental impairment, however slight its impact on the employee's work performance may be, and took some adverse action against that employee. As a matter of law, "the mere fact that an employer is aware of an em-

ployee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly,* 94 F.3d at 109.

Finally, Grabosky suggests that the fact that he was fired while other collectors who did not have heart conditions were retained is sufficient to support an inference that Tammac perceived Grabosky as substantially limited in the major life activity of working. Grabosky asserts that this conclusion is corroborated by the fact that two other employees who "had recently suffered heart attacks or other similar incidents were also terminated around the same time frame as Grabosky." (Plf's Br. in Opp. to S.J.Mot. at 9.) Succinctly stated, the conclusion drawn by Grabosky does not rationally flow from the premise. At best, the inference that can be drawn is that Tammac did not want persons who had cardiovascular problems on its payroll. While such a position would be condemnable, it does not reveal an attitude that persons with heart conditions are incapable of working or substantially limited in work activities. As Justice O'Connor explained in *Sutton,* under the ADA an employer "is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." 527 U.S. at 490–91, 119 S.Ct. 2139. " 'The Act is not a general protection of medically afflicted persons.... [I]f the employer discriminates against them on account of their being (or being believed by him to be) ill, even permanently ill, but not disabled, there is no violation.' " *Harrington v. Rice Lake Weighing Systems, Inc.,* 122 F.3d 456, 460 (7th Cir.1997).[13]

Grabosky has not adduced any competent evidence that any Tammac decision-maker regarded his heart condition as substantially limiting a major life activity. The fact that Grabosky's work performance was satisfactory and he was nonetheless terminated does not suggest that Tammac regarded him as disabled. As explained in *Harrington,* "[t]he notion that [defendant] must have fired [plaintiff] because it regarded him as disabled and that it plainly regarded him as disabled because it fired him is attractive but circular—it lacks a causal antecedent." *Id.* at 461.

Grabosky does not contend that he was substantially limited at work, and the facts are consistent with a conclusion that Grabosky remained fully capable of working. Grabosky acknowledges that at no time during his employment were any negative comments made with respect to his health. There is simply no evidence that Tammac regarded Grabosky as disabled. Speculation as to Tammac's motives for firing Grabosky are not sufficient to support an inference that Tammac regarded Grabosky as disabled. Because Grabosky has not presented competent evidence to show that he is a person with a "disability" within the coverage of the ADA, Tammac is entitled to summary judgment on the ADA claim.

### 2. *ADEA Claim*

The ADEA bans employment discrimination "because of an individual's age," 29 U.S.C. § 623(a)(1), but limits protection to those "who are at least forty years of age." 29 U.S.C. § 631(a). "This language does not ban discrimination against employees because they are aged forty or older; it bans discrimination against employees because of their age, but limits the protected class to those who are forty or older." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308,

---

**13.** Grabosky has not shown that the two other terminated employees were similarly situated to Grabosky, and the evidence suggests otherwise. For example, James Steinkirchner suffered some dizzy spells. There is no evidence, however, that he was hospitalized. Moreover, he did not hold the position of collector. The other discharged employee, William Davis, underwent open heart surgery. He was employed in a different division. These differences preclude a rational inference that Tammac's firing of Davis and Steinkirchner means that Tammac regarded Grabosky as disabled.

312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

In this case, the parties are in agreement that the *McDonnell Douglas* evidentiary framework is applicable. As with respect to Grabosky's ADA claim, the initial inquiry is whether plaintiff has presented evidence sufficient to establish the elements of a prima facie case. The parties are also in agreement that Grabosky has satisfied three of the four components of a prima facie case · of age discrimination—(1) he is a member of the protected class in that he was forty-five years old at the time of the challenged employment action; (2) he was qualified for the position he held and was performing his work satisfactorily; and (3) he suffered an adverse employment decision by being fired.

The parties vigorously dispute, however, the content of the fourth element of a prima facie case of age discrimination. Citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997), Tammac insists that it is incumbent upon the plaintiff to present evidence that he was replaced by a sufficiently younger person so as to create an inference of age discrimination. (Br. in Support of S.J.Mot. at 10.) Contending that Grabosky's replacement is ten years older than Grabosky, Tammac argues that Grabosky cannot establish a prima facie case of age discrimination. While not conceding that his replacement was Bruce Popalis, who is his senior by ten years, Grabosky argues that he is not required to show that he was succeeded by a sufficiently younger person to suggest age discrimination. Citing *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 347 (3d Cir.1999), Grabosky maintains that he is only required to show circumstances giving rise to an inference of unlawful discrimination.

The threshold question, therefore, is whether a showing that the plaintiff was replaced by a younger person is an essential element of a prima facie age discrimination case. Third Circuit decisions are far from perspicuous on this question.

For example, in *Showalter v. University of Pittsburgh Medical Center,* 190 F.3d 231, 234–36 (3d Cir.1999), the court referred to the need of the plaintiff to show in a reduction in force context that "the retained workers were 'sufficiently younger' than he was at the time of discharge." Similarly, in *Simpson v. Kay Jewelers, Division of Sterling, Inc.,* 142 F.3d 639, 644 (3d Cir.1998), the court stated that in the case of a demotion or discharge the plaintiff must show that she "was replaced by a sufficiently younger person to create an inference of age discrimination." But these cases did not concern the question of whether replacement by a younger person is a *sine qua non* of an age discrimination case. In other contexts, the Third Circuit has expressly held that consideration of the plaintiff's replacement was *not* a dispositive aspect of a prima facie employment discrimination case. *E.g., Pivirotto,* 191 F.3d at 354. Having considered the purposes served by a prima facie case, the Supreme Court's holding in *O'Connor,* and cases in the employment discrimination context addressing the precise issue presented here, I am convinced that the Third Circuit would not hold that a plaintiff must show that he or she was replaced by a younger person as part of a prima facie age discrimination case.

"As the very name 'prima facie case' suggests, there must be at least a logical connection between· each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'" *O'Connor,* 517 U.S. at 311–12, 116 S.Ct. 1307. The purpose served by the prima facie requirement is to obligate a plaintiff to "eliminate the most obvious, lawful reasons for the defendant's action (i.e., the position that an applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually taken, etc.)." *Pivirotto,* 191 F.3d at 352. As explained in *Furnco Construction Corp. v. Waters,*

438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978):

> The method suggested in *McDonnell Douglas* for pursuing this inquiry ... was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

In *Pivirotto*, the court recognized that the force of this logic is that, while replacement by a person outside the protected class may support an inference of discrimination, replacement by someone within the protected class is not necessarily inconsistent with an impermissible class-based discrimination decision. 191 F.3d at 353–54. As Chief Judge Becker explained:

> The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence. But this fact does not, as a matter of law or logic, foreclose the plaintiff from proving that the employer was motivated by her gender (or other protected characteristic) when it discharged her. *Id.* at 354.

In holding that a plaintiff claiming discriminatory firing need not prove, to make out a prima facie case, replacement by someone outside the relevant class, the Third Circuit relied upon *O'Connor*. At issue in *O'Connor* was whether an age discrimination plaintiff "must show that he was replaced by someone outside the age group protected by the ADEA to make out a prima facie case ...." 517 U.S. at 309, 116 S.Ct. 1307. Significantly, while reasoning that "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class," *id.* at 313, 116 S.Ct. 1307, the Court did not hold that replacement by a younger person was an essential component of a prima facie age discrimination case. Instead, it found "the proper solution" to be that a plaintiff present " 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion....' " *Id.* at 312, 116 S.Ct. 1307.

Judicial officers in the Western and Eastern Districts of Pennsylvania have rejected the argument that replacement by a younger person is an essential element of a prima facie age discrimination case. *See, e.g., Taylor v. Liberty Mutual Ins. Co.,* No. Civ. A. 97–2418, 2000 WL 288391 (E.D.Pa., March 7, 2000); *Roach v. American Radio Systems Corp.,* 80 F.Supp.2d 530, 531–32 (W.D.Pa.1999). It is enough that the plaintiff present evidence sufficient to establish an inference that the employment decision was based on the plaintiff's age. *Danas v. Chapman Ford Sales, Inc.,* 120 F.Supp.2d 478, 484 (E.D.Pa.2000). While a plaintiff could establish this element by showing that "adverse employment action was taken to the detriment of a member of the protected class and to the benefit of another, significantly younger worker," *id.* at 486, a plaintiff is not required to do so. After all, the concept of a prima facie case was not intended to be "rigid, mechanized, or ritualistic." *Furnco Construction Corp.,* 438

U.S. at 577, 98 S.Ct. 2943. "[A] prima facie case cannot be established on a one-size-fits-all basis." *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir.1999). Requiring a terminated plaintiff to show replacement by a younger person is a mechanistic and ritualistic approach that may serve to defeat otherwise meritorious claims. This is so because "[t]he replacement of a terminated plaintiff with an individual who shares the plaintiff's protected attribute does not necessarily negate the inference that the plaintiff was unlawfully discriminated against." *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir.1999), *cert. denied*, 529 U.S. 1110, 120 S.Ct. 1964, 146 L.Ed.2d 796 (2000).

Of course, merely showing membership in a protected class along with termination from a position for which the plaintiff was qualified is not enough to raise an inference of illegal discrimination. Such a showing does not eliminate one of the common, non-discriminatory reasons for the adverse employment decision—the absence of available work for that position. In the original formulation of the prima facie case, the Court in *McDonnell Douglas* recognized that an inference of discrimination was justifiable where the plaintiff shows that "after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. 1817. In *Pivirotto*, our Court of Appeals explicitly agreed with the First Circuit's holding in *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 155 (1st Cir.1990), that where, as here, the adverse employment action is termination, "a complainant can satisfy the fourth prong of her prima [facie] case simply by showing that ... the employer had a continued need for 'someone to perform the same work after the complainant left.'" *Pivirotto*, 191 F.3d at 354. The Tenth Circuit recently followed *Cumpiano* in an employment discharge setting. *See Perry*, 199 F.3d at 1138–39. In language particularly apropos here, the Tenth Circuit explained the rationale for its holding as follows:

> When viewed against a backdrop of historical workplace discrimination, an employee who belongs to a [protected class] and who eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors. The firing of a qualified [protected class] employee raises the inference of discrimination because it is facially illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.

> The purpose behind the prima facie requirement established in *McDonnell Douglas* is to obligate a plaintiff to 'eliminate ... the most common nondiscriminatory reasons for the plaintiff's rejection.' An inference of discrimination is raised when an employer rejects an otherwise qualified [protected class] employment candidate and thereafter does not eliminate the position for which the candidate was rejected. Evidence of the seeking or hiring of a replacement to fill the position vacated by a discharged plaintiff who is a member of a group which has historically suffered discriminatory treatment is, by itself, sufficient to satisfy the fourth element of the plaintiff's *McDonnell Douglas* prima facie case of [employment] discrimination. *Id.* at 1140.

In *Pivirotto*, our Court of Appeals, consistent with the view that the elements of the prima facie case in the employment discrimination context are not to be rigid, failed to define the fourth element in terms more than that the plaintiff present evidence "'adequate to create an inference' of unlawful discrimination." 191 F.3d at 355. In citing with approval *Cumpiano*, the Third Circuit, however, necessarily recognized that in some contexts the fact that

the employer hires a replacement for an otherwise qualified plaintiff is sufficient to support the claimed inference. Moreover, I find compelling the Tenth Circuit's explanation in *Perry* as to why the fourth element of a prima facie case in an employment discharge setting should be that the position held by the plaintiff remained open. Accordingly, I find that, in the context of this case, the content of the final element of the plaintiff's prima facie case is whether the plaintiff's position remained vacant and/or was filled by another person.

In this case, the position held by Grabosky at the time of his firing required him to cover both the northeastern and southeastern Pennsylvania sales territories. It is undisputed that Tammac continued to have a need for a person to serve as the field collector for these sale territories after Grabosky's discharge. Indeed, it is Tammac's position that it in fact hired a replacement for Grabosky. Thus, Grabosky has satisfied the elements of a prima facie case of age discrimination.

■ Tammac contends that it is nonetheless entitled to summary judgment because Grabosky cannot present evidence sufficient to call into question the reasons articulated by Tammac for replacing Grabosky. Tammac's articulated reason for its employment decision is that, "after giving Plaintiff an opportunity to handle Tammac's southeastern Pennsylvania territory, ... it required an adjustor/field collector who resided closer to southeastern Pennsylvania." (Tammac Reply Brief (Dkt. Entry 39) at 6.)

Grabosky has responded to Tammac's proffer by presenting evidence that, at the time of his discharge, he was told that he was laid off due to a lack of work, not because Tammac was looking for a field collector who resided closer to southeastern Pennsylvania. (Grabosky Dep. at 96–101.) Grabosky has also presented evidence that his job performance was satisfactory, thereby calling into question Tammac's assertion that Grabosky's refusal to spend nights on the road adversely impact-ed his efficiency. While Tammac management had discussed with Grabosky the matter of him spending nights on the road while working in the southeastern Pennsylvania area, Grabosky points out that there is no evidence that he was informed that his refusal to do so jeopardized his job. And while Tammac contends that it discussed the matter of overnight stays during the meeting at which Grabosky was terminated, Grabosky disputes this account. (Grabosky Dep. at 96–97.) Finally, Grabosky has presented sufficient evidence from which a rational inference could be drawn that decision-makers at Tammac were aware of his heart condition. Although Grabosky was not fired until approximately 18 months after he was hospitalized for his heart condition, Grabosky has presented evidence that under the presidency of William J. Smith, which commenced in August of 1995, two other employees in the protected class with heart conditions or similar problems were terminated. As Judge McClure observed in denying summary judgment in Steinkirchner's case, the targeting for employment termination of employees over the age of 40 who have a heart condition or similar problem "could be viewed as a form of age discrimination." *Steinkirchner v. Tammac Corp.*, No. 4:CV–98–0468 (M.D.Pa. Nov. 19, 1999).

In summary, Grabosky has presented sufficient evidence to call into question the reasons articulated by Tammac for its decision to fire him. While an inference of age discrimination in the context of this case is not compelling, the evidence is adequate to withstand the summary judgment motion. Accordingly, Tammac is not entitled to summary judgment on the ADEA and PHRA age-based claims.

### C. Timeliness of the PHRA claim

■ Tammac argues that Grabosky's PHRA claim must be dismissed because Grabosky failed to timely file his administrative complaint with the PHRC. Under the PHRA, a claim must be filed with the

PHRC within 180 days of the discriminatory act. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir.1997), *cert. denied*, 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997); *Sharp v. BW/IP International Inc.*, 991 F.Supp. 451, 457 (E.D.Pa.1998). If a plaintiff fails to file a timely complaint, he or she is precluded from any judicial remedy under the PHRA. *Id.*

As a general rule, a layoff, regardless of the likelihood of recall, becomes permanent, for purposes of timeliness, at the time of the initial layoff. *See Lawson v. Burlington Industries, Inc.*, 683 F.2d 862, 863–64 (4th Cir.), *cert. denied*, 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982); *Nogar v. Henry F. Teichmann, Inc.*, 640 F.Supp. 365, 368 (W.D.Pa.1985), *aff'd mem.*, 800 F.2d 1137 (3d Cir.1986); *Cutright v. General Motors Corp.*, 486 F.Supp. 590, 593 (W.D.Pa.1980). It is undisputed that Grabosky was told he was being laid off on February 19, 1996. As a result, Grabosky's filing with the PHRA on September 6, 1996, more than 180 days later, would be untimely absent a basis for equitable tolling.

The Third Circuit in *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir.1994), described three situations in which equitable tolling may be appropriate:

(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action;

(2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or

(3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.

Grabosky does not contend that he was in some "extraordinary way" prevented from asserting his rights, or that he mistakenly asserted his rights in the wrong forum. Rather, Grabosky asserts that Tammac's explanation of the reason for his layoff, along with its future action towards him, misled him into believing that he was dismissed due to insufficient work. "[W]here a defendant actively misleads the plaintiff regarding the reason for the plaintiff's dismissal, the statute of limitations will not begin to run, that is, will be tolled, until the facts which would support the plaintiff's cause of action are apparent, or should be apparent to a person with reasonable prudent regard for his or her rights." *Oshiver*, 38 F.3d at 1389; *see also Meyer v. Riegel Products Corp.*, 720 F.2d 303 (3d Cir.1983) (an employer's acts or omissions may lull the plaintiff into foregoing attempts to vindicate his or her rights), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Because Grabosky did not learn he was replaced until August of 1996, and thus did not consider pursuing a claim until that time, he contends that his filing with the PHRC in September of 1996 should be considered timely.

Grabosky asserts that Tammac told him that he was being laid off because of lack of work. When Grabosky asked Tammac whether things could change in the future, Grabosky contends that he was told that there was always a possibility. A few months later, Tammac recalled Grabosky to work for a brief period of time. Grabosky alleges that during a recall period he spoke with Don Brown about his chances of returning to work and he was again told that there was a possibility. In August of 1996, Grabosky learned that his position had been filled by another individual. According to Grabosky, it was not until that date that he realized that he would not be recalled and that he considered asserting his rights.

Tammac argues that it made clear to Grabosky at the time of his layoff that there was insufficient work in northeastern Pennsylvania. For purposes of this motion, however, the evidence must be viewed in the light most favorable to Grabosky, and he has given a somewhat different account. Because the evidence is conflicting, summary judgment on the timeliness of the PHRA complaint is not appropriate. *See*

*Meyer,* 720 F.2d at 307 (alleged employer misrepresentations as to reason for employee's discharge created an issue of fact as to the timeliness of employee's filing, precluding summary judgment); *Labus v. Navistar Intern. Transp. Corp.,* 740 F.Supp. 1053, 1059 (D.N.J.1990) (employer's representation that it would look for another position for employee could have lulled employee into failing to assert rights, precluding summary judgment). Accordingly, summary judgment on the timeliness issue will be denied.

### D. Remaining Issues

While Grabosky may seek liquidated damages under the ADEA, there is no dispute that he is not entitled to compensatory or punitive damages under the federal statute. There is also no dispute that he may not seek punitive damages under the PHRA. Accordingly, Tammac is entitled to an order precluding recovery of such damages under the respective federal and state causes of action.

■ Citing *Wertz v. Chapman Township,* 559 Pa. 630, 741 A.2d 1272 (1999), Tammac contends that Grabosky is not entitled to a trial by jury with respect to his PHRA claims. *Wertz,* however, did not purport to decide whether there would be a right to a jury trial on a PHRA claim in federal court as a consequence of the right to jury trial guaranteed by the Seventh Amendment to the United States Constitution. 741 A.2d at 1278–79 & n. 5. This precise question was addressed comprehensively by another member of this Court in *Cortes v. R.I. Enterprises, Inc.,* 95 F.Supp.2d 255 (M.D.Pa.2000). In *Cortes,* the Hon. A. Richard Caputo held:

> Since the plaintiff seeks a determination of legal rights vis a vis the defendants, and because she seeks a legal remedy for the alleged violation of those rights, the ... plaintiff establishes entitlement, under the Seventh Amendment, to jury trial in federal court on her legal claims brought under the PHRA. Non-legal, i.e., equitable claims, will be tried to the Court.

*Id.* at 262.

I am persuaded by Judge Caputo's thorough analysis of the issue, and adopt his reasoning. Consistent with *Cortes,* Grabosky will be entitled to present his claims for compensatory damages under the PHRA to a jury.[14]

### CONCLUSION

For the reasons set forth above, Tammac will be granted summary judgment as to Grabosky's claims based upon alleged disability discrimination. In all other re-

---

14. Tammac has moved for sanctions in relation to affidavits signed by Robert Fallon, a former employee of Tammac. Mr. Fallon signed three affidavits, the first at the instance of Tammac, the second at the instance of Grabosky, and the final one at the instance of Tammac. At issue in Tammac's sanctions motion is the statement in paragraph 14 of the second affidavit that the first affidavit was signed "based upon [Tammac] counsel's representation to me that the information contained in the Affidavit was accurate." In his third affidavit, Fallon clarified the statement in paragraph 14 by adding the explanation that the statements made in his first affidavit were based upon his personal knowledge, that he knew that counsel for Tammac did not have personal knowledge of the facts contained in his first affidavit, and that he had been given sufficient opportunity to review and make revisions to his first affidavit. In moving for sanctions, Tammac's counsel ar-

gues that paragraph 14 of the second affidavit was presented for improper purposes and, therefore, should be stricken, with monetary sanctions awarded in favor of Tammac. This contention deserves little discussion. Paragraph 14 of the second affidavit, standing alone, is an ambiguous explanation as to why Fallon signed the first affidavit. While it could be construed as some indication that he simply signed what was presented to him without verifying its accuracy, it can also be read as indicating that he relied upon defense counsel in re-stating the information he had provided. His third affidavit dispels an interpretation of ¶ 14 that the first affidavit was not based upon facts within his own knowledge. Under these circumstances, there is no need to strike ¶ 14 of the second affidavit. Moreover, there is no evidence of bad faith on the part of any attorney in this matter, and sanctions are, therefore, not warranted.

spects, Tammac's summary judgment motion will be denied.