

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-2007

# Marra v. Phila Housing Auth

Precedential or Non-Precedential: Precedential

Docket No. 06-1140

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Marra v. Phila Housing Auth" (2007). *2007 Decisions.* Paper 512.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/512

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1140

_____

EDWARD J. MARRA, JR.;
ALBERT DIGRAVIO

v.

PHILADELPHIA HOUSING AUTHORITY,
MILTON D. SOIFERMAN

Philadelphia Housing Authority,
Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 03-cv-03832)
District Judge: Honorable Eduardo C. Robreno

_____

Argued March 6, 2007

Before: SLOVITER and AMBRO, Circuit Judges

THOMPSON,[*] <u>District Judge</u>

(Opinion filed: August 2, 2007)

Melanie M. Kennedy, Esquire (Argued)
Cozen & O'Connor
1900 Market Street, 3rd Floor
Philadelphia, PA  19103

Jessamyne M. Simon, Esquire
Buchanan Ingersoll & Rooney
1835 Market Street, 14th Floor
Philadelphia, PA   19103

 Counsel for Appellant

Nancy D. Wasser, Esquire (Argued)
1617 John F. Kennedy Boulevard
One Penn Center, Suite 1130
Philadelphia, PA   19103

 Counsel for Appellees

OPINION OF THE COURT

AMBRO, <u>Circuit Judge</u>

[*]Honorable Anne E. Thompson, Senior United States District
Judge for the District of New Jersey, sitting by designation.

2

The Philadelphia Housing Authority ("PHA") appeals from jury verdicts in favor of plaintiffs Edward Marra and Albert DiGravio on their claims for unlawful retaliation under the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §§ 951-963. PHA raises a host of challenges before us, contesting the admission of certain evidence at trial, the sufficiency of the evidence supporting the verdicts, and the consistency of those verdicts with particular findings made by the jury on the plaintiffs' other claims for relief. PHA also argues, based on a misreading of our decision in *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49 (3d Cir. 1989), that the right to a jury trial on state law claims brought in federal court is governed by state, rather than federal, law, and that, as matter of uncontroverted Pennsylvania law, Marra and DiGravio had no right to have a jury decide their PHRA claims. We reject all of PHA's contentions and affirm.

## I. Factual Background and Procedural History

PHA, a state agency employing approximately 2,000 people, is responsible for developing and operating public housing in the City of Philadelphia. At the time of the adverse employment decisions that form the basis of their retaliation claims, Edward Marra and Albert DiGravio were both employed in supervisory positions in the Inspections Division of PHA's

3

Design and Construction Department.[1]  DiGravio served as a Rehabilitation Supervisor, a low-level supervisory position, directly supervising approximately fifteen housing inspectors (also known as Rehabilitation Specialists).  Marra worked as a Project Manager, a higher level supervisory position, directly supervising Nicholas DiPiero, Construction Manager, to whom DiGravio reported.  Marra's direct supervisor was Georgette Galbreth, Assistant General Manager of the Design and Construction Department, who in turn reported to Ramesh Panchwagh, General Manager of the Design and Construction Department.  Panchwagh's direct supervisor, Deputy Executive Director Michael Leithead, reported directly to PHA's highest ranking official, Carl Greene, Executive Director.[2]  Events giving rise to plaintiffs' respective claims, viewed in the light

---

[1]The Design and Construction Department included four divisions: Capital Projects, Environmental Services, Inspections, and Utility Management.

[2]In short, DiGravio and Marra ranked as follows in the PHA pecking order (at least as pertinent here):
1. Carl Greene
2. Michael Leithead
3. Ramesh Panchwagh
4. Georgette Galbreth
5. Marra
6. Nicholas DiPiero
7. DiGravio
8. Housing Inspectors

most favorable to each of them, are recounted below.

### A.     Edward Marra

In 1996, PHA hired Marra to work as Director of the Inspections Division.  In this capacity, he was responsible for arranging and overseeing the inspection of houses that had been rehabilitated by PHA to ensure compliance with all pertinent housing codes, regulations and specifications.  At the time, among the several housing inspectors who worked under Marra were DiGravio, Gerald Paladino, and James Wright.

In 1997, PHA created a new supervisory position in the Inspections Division entitled Rehabilitation Supervisor.  It held a competition among the housing inspectors to fill three available Rehabilitation Supervisor positions.  Marra chaired a panel that conducted interviews of the candidates and ultimately recommended the promotion of Paladino, Wright, and DiGravio to fill the new positions.  Formal notices of appointment were sent to both Paladino and Wright but later rescinded after George Fields, an African American candidate, filed a grievance charging race discrimination in the selection process.  After holding a second competition, PHA opted not to promote Paladino or Wright, instead awarding the three Rehabilitation Supervisor positions to DiGravio, Fields, and a third inspector named Leonard Panarella.

In December 1999, Paladino and Wright filed a reverse-

5

race discrimination lawsuit against PHA in federal court, asserting violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the PHRA, among other statutes.[3] *Paladino v. Philadelphia Hous. Auth.*, Civ. A. No. 99-6424 (E.D. Pa.) (hereinafter, "*Paladino*"). In the course of discovery, Paladino and Wright subpoenaed Marra to give deposition testimony. On June 2, 2000, shortly after being deposed, Marra received a written notice, signed by Executive Director Greene, among others, advising him that he had been "involuntarily demoted" to the position of Project Manager. Although his salary and job duties were not materially affected by the demotion, Marra did lose a $425 monthly stipend to cover the costs of using his private vehicle for PHA business.

Approximately one year later, in June 2001, the *Paladino* case proceeded to trial. Marra testified on behalf of Paladino and Wright, appearing by subpoena. The jury subsequently returned a verdict in favor of both Paladino and Wright and against PHA, finding that PHA had discriminated against them in violation of Title VII and the PHRA.[4]

---

[3]Fields and three other PHA employees (no one of whom is of particular relevance to our case) were also named as defendants.

[4]On appeal, we overturned the verdicts against PHA, finding them to be inconsistent with the jury's verdicts in favor of the individual defendants on the same claims, and ordered the District Court to enter judgment as matter of law in favor of

After testifying at the *Paladino* trial, Marra went on vacation. On his return to work in early July 2001, he discovered that the hard drive on his computer had been "totally wiped out," resulting in an extensive loss of work product that he would be forced to prepare anew. App. at 222. Marra immediately reported the computer damage to PHA's Information Systems Management, and sent a written memorandum to his supervisors, Panchwagh and Galbreth, alerting them to what he believed to be suspicious activity. A PHA employee from Information Systems Management later informed Marra that his computer had "burned out" without providing any additional details. Marra had never before experienced any problems with his computer. To the best of his knowledge, PHA never conducted an independent investigation into whether the computer crash was the product of foul play.

At some point shortly after his return from vacation, Marra attended a meeting at which Greene was present. During the meeting, Greene pointedly asked Marra whether he had testified at the *Paladino* trial. When Marra answered yes, Greene reacted with a "look of disgust." App. at 296.

---

PHA. *Paladino v. Philadelphia Hous. Auth.*, 65 Fed. Appx. 385, 2003 WL 1550963 (3d Cir. Mar. 26, 2003) (not precedential). We note that the *Paladino* appeal was decided long after PHA committed the allegedly retaliatory acts that form the basis of the claims in this lawsuit.

A few months later, in the fall of 2001, at the request of Greene and Deputy Executive Director Leithead, Panchwagh and Galbreth undertook an evaluation of the Inspections Division's ongoing staffing needs as part of a reorganization project designed to streamline operations within several of PHA's departments and divisions. Over the next several months, with Galbreth's assistance, Panchwagh prepared a series of memoranda giving his recommendations for reorganization of the Inspections Division, which he forwarded to Leithead for review. In the first memorandum, dated November 14, 2001, Panchwagh recommended the elimination of the Project Manager position, which was held by Marra, as well as four inspector positions, based on a dearth of available work. In particular, Panchwagh opined that the Inspections Division's "hierarchy consist[ing] of four management layers above the field staff [i.e., Assistant General Manager, Project Manager, Construction Manager, and Rehabilitation Supervisor] . . . is an ineffective use of resources . . . [,] le[aving] very little work for the Project Manager, even at full workload and staffing levels." App. at 870. Panchwagh also believed that the elimination of four inspector positions would "provide a more effective use of resources." App. at 871. According to Marra, however, both he and his subordinates in the Inspections Division had more than enough work throughout the second half of 2001, including a major construction project that had been assigned to him directly from Greene and needed to be completed by year's end, as well as several other projects that continued into 2002.

In his second memorandum to Leithead, dated December 4, 2001, Panchwagh reiterated his recommendation that Marra's position be eliminated, specified by name three of the four inspectors whose positions he recommended eliminating based on date of hire, and noted that the Human Resources Department would select the fourth inspector position to eliminate. Panchwagh submitted various additional materials with the memorandum, including draft lay-off notices for Marra and the selected inspectors.

Panchwagh's third and final memorandum to Leithead, however, recommended a reorganization of the Inspections Division that was considerably smaller in scope. Panchwagh now urged the elimination of Marra's position alone, his memorandum making no mention of the four inspector positions he had recommended eliminating twice previously. This final memorandum was sent to Leithead on March 19, 2002.

Three days later, at a meeting attended by Panchwagh, Galbreth, and a representative from the Human Resources Department, Marra was informed that his position had been eliminated as part of a reorganization of the Inspections Division and that he would be laid off at the close of business that day. Marra was naturally skeptical, this being the first he heard about the reorganization, and decided to seek out Panchwagh after the meeting in the hope of obtaining more information. In response to Marra's queries, however, Panchwagh claimed to know nothing. At the time of his termination, Marra was sixty-eight

years old and had planned on retiring within the next year and a half.

## B. Albert DiGravio

DiGravio also was deposed by Paladino and Wright and testified on their behalf at trial, appearing by subpoena on both occasions. During this period of time, DiGravio continued to work as a Rehabilitation Supervisor, the position to which he had been promoted after his successful participation in the hiring competition under scrutiny in *Paladino*. As a Rehabilitation Supervisor, DiGravio no longer performed housing inspections himself, but was instead responsible for directly supervising the Rehabilitation Specialists who performed this task. While DiGravio occasionally visited the inspection sites (which primarily consisted of newly constructed or rehabilitated houses) as part of his supervisory duties, he spent the majority of the work week in his office at PHA reviewing reports of housing inspections and completing related paperwork.

In the days leading up to the *Paladino* trial, Nicholas DiPiero, DiGravio's immediate supervisor, repeatedly told him that any supervisory or management level employee who testified against PHA at trial would face "repercussions." Paladino himself overheard DiPiero make these remarks to DiGravio on one occasion.

In late July 2001, roughly six weeks after the conclusion

10

of the *Paladino* trial, Panchwagh convened a meeting of the Inspections Division's supervisory personnel to discuss assisting PHA's Section 8 Department with a backlog of Section 8 housing inspections.[5]   Those attending included Galbreth, DiPiero, and DiGravio, but not Marra, who was not informed about the meeting.  At the request of Greene, the Inspections Division had previously loaned the services of several of its inspectors, each of whom had been selected by Marra, to assist the Section 8 Department in this undertaking.  These efforts proved to be largely unsuccessful, however, with many of the loaned inspectors refusing to show up for further assignments after only a few days of conducting inspections in Section 8 houses, which were often in deplorable condition and infested with vermin and other pests.  At the supervisors' meeting, Panchwagh conveyed his concerns about the lackluster effort by the inspectors on loan, and sought input on how to improve their performance. In response, DiGravio advised Panchwagh that he would be willing personally to oversee a group of inspectors to ensure that the Section 8 inspections were properly performed. Panchwagh agreed to this idea.

---

[5]Section 8 refers to the federal section 8 rental assistance program that was established under the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, to "provide[] rent subsidies for low- and moderate-income participants so that they can afford to lease privately owned housing units."  *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 544 n.4 (3d Cir. 2006).  PHA administers the Section 8 program within the City of Philadelphia.

11

Upon arriving at work a few days later, DiGravio was puzzled to learn that he was to begin immediately reporting to the Section 8 Department for future assignments. He had not volunteered for reassignment, and it was his understanding from the meeting with Panchwagh that he would be doing nothing more than supervising a group of inspectors, who were themselves being loaned to the Section 8 Department to perform inspections, while he personally continued to work in the Inspections Division. DiGravio immediately confronted Panchwagh about his unexpected reassignment. After Panchwagh assured DiGravio that he would only be "organizing" inspections in the Section 8 Department on a "very temporary" basis, he agreed to lend his services, figuring that "it could only be another feather in my cap to go over there and try to do something." App. at 369-70, 372, 518. Much to his chagrin, however, DiGravio learned upon reporting to the Section 8 Department that he would not continue working in a supervisory capacity, as he expected, but would be performing inspections himself of the Section 8 housing. When DiGravio again confronted Panchwagh to express his resentment over what he perceived to be a demotion, Panchwagh simply told him that the decision had come "from on top," which DiGravio believed meant either Greene or Leithead, and that he (Panchwagh) had nothing to do with it.

DiGravio thereafter memorialized his disapproval of the reassignment in the following letter to Panchwagh, dated August 2, 2001, copies of which he also forwarded to Galbreth, Marra,

and DiPiero:

> As per your directive, I have reported to Section 8 . . . . As you are well aware of [sic], I've been assigned to do inspection work for the Eligibility Department. My current status is a supervisor position. I can only consider this a demotion for some unknown reason.

> However, being a true PHA employee, I will tackle this new assignment with the same dedication as I have approached my other assignments.

> I would like to be consulted of this change and status as to why and what direction I am going into.

App. at 927.

By reply memorandum dated August 8, 2001, Panchwagh sought to assure DiGravio that his transfer to the Section 8 Department was not a demotion since his salary and official title would not be affected, and claimed that the transfer "was made . . . [after] consultation with you." App. at 858.

Marra also protested DiGravio's transfer to the Section 8 Department, insisting to Panchwagh that he needed

13

DiGravio's assistance on several ongoing projects, including the time-sensitive assignment from Greene. In response, Panchwagh assured Marra, as he had DiGravio, that the latter would return to the Inspections Division within a matter of weeks.

Notwithstanding Panchwagh's assurances to the contrary, DiGravio's stint in the Section 8 Department was anything but brief. For nearly three years, DiGravio conducted inspections of Section 8 houses, trading in his business casual work attire for boots and dungarees, and had no supervisory responsibilities. DiGravio endured hazardous working conditions and was regularly infested with fleas and lice. He no longer had an office, secretary, telephone, or access to a PHA vehicle for professional business. DiGravio's supervisory position in the Inspections Division was restored only after Carolyn Carter, Executive General Manager of the Section 8 Department, determined that his services were no longer needed in May 2004.

## C. Litigation

In June 2003, while DiGravio was still working in the Section 8 Department, he and Marra filed this suit against PHA, alleging that they were the victims of unlawful retaliation for testifying at the *Paladino* trial, in violation of the First Amendment (as enforced by 42 U.S.C. § 1983), Title VII, and the PHRA. The Title VII claims were dismissed for failure to

14

exhaust available administrative remedies, but the remaining claims were tried to a jury. At trial, PHA's witnesses testified that Marra was terminated as part of a reorganization and that DiGravio was transferred to the Section 8 Department to perform inspections based on the needs of that Department and his offer to volunteer his services, not because of their respective participation in the *Paladino* trial.

Although the decision to terminate Marra's position was formally approved by Leithead, Panchwagh testified that he was responsible for deciding which positions to eliminate within the Inspections Division. Leithead confirmed that he did not instruct Panchwagh to eliminate any certain position as part of the reorganization, and that he approved Panchwagh's final recommendation to terminate Marra without conducting any independent investigation because he thought the proposal made legitimate business sense. Leithead also testified that he had approved Panchwagh's initial reorganization proposal, contained in the latter's November 2001 memorandum, but instructed Panchwagh to submit it to the Human Resources Department for review.

Galbreth testified that it became unnecessary to eliminate three of the four inspector positions because she and Panchwagh discovered that two of the inspectors whose positions were designated for elimination were planning to retire in the near future and a third was being transferred to another department. Yet she offered no explanation for why the fourth inspector

15

position was not eliminated as part of the reorganization. Panchwagh and Galbreth both denied having any knowledge of Marra's retirement plans at the time of his termination.

According to Leithead, approximately twenty-five PHA employees under Panchwagh's supervision were transferred to other positions as part of the reorganization, including several Project Managers, but Marra was the only employee to lose his job. Panchwagh admitted that, from the time he began working at PHA in July 1999 to his retirement in April 2002, Marra was the only employee laid off within the entire Design and Construction Department.

Contrary to DiGravio's understanding, Panchwagh testified that he alone was responsible for making the decision to reassign DiGravio to the Section 8 Department to perform inspections, and that he did so "upon [DiGravio] offering . . . to go," App. at 472, believing that "the inspectors . . . w[ould] be . . . more amenable to [the] work" if "a supervisor" were present. App. at 471. Panchwagh admitted that he had the authority to recall DiGravio to the Inspections Division without seeking approval from his superiors, Greene and Leithead, but never did so prior to his (Panchwagh's) retirement from PHA in April 2002. He insisted that he had "no reason" to recall DiGravio based on the ongoing needs of the Section 8 Department. App. at 579.

Panchwagh further testified that Marra was responsible

16

for deciding which inspectors would be transferred with DiGravio to the Section 8 Department because Marra "was in charge of the Inspection[s] Division," App. at 472, and "I was not running the day-to-day affairs of th[at] d[ivision]." App. at 586. Galbreth testified that, based on her conversations with Panchwagh, she had the impression that DiGravio would only be working in the Section 8 Department for "maybe a month," App. at 659, and that she "absolutely" knew that the PHA employees in other departments and divisions did not affirmatively desire to work in the Section 8 Department. App. at 683. Both Panchwagh and Galbreth conceded that DiGravio was the only supervisory level employee ever sent to the Section 8 Department to perform inspections. For his part, DiPiero testified that he never made any remarks to DiGravio suggesting that supervisory or management level employees who testified against PHA at the *Paladino* trial would face "repercussions."[6]

The jury returned verdicts in favor of both Marra and DiGravio under § 1983 and the PHRA. The District Court, however, entered judgment in favor of PHA on the § 1983 claims based on the jury's additional finding that Greene, who the District Court had provisionally determined was the only PHA official whose conduct could be attributed to PHA for purposes of municipal liability under § 1983, did not personally order or acquiesce in any retaliation against Marra or DiGravio. The verdict on the PHRA claims stood. The District Court

---

[6]Executive Director Greene did not testify at trial.

17

entered judgment in favor of Marra for $310,676, representing $208,676 in back pay and $102,000 in compensatory damages, and in favor of DiGravio for $70,000 in compensatory damages (all as had been found by the jury). After the District Court denied PHA's post-trial motions for judgment as a matter of law or, in the alternative, a new trial, *see Marra v. Philadelphia Hous. Auth.*, 404 F. Supp. 2d 839 (E.D. Pa. 2005), PHA filed this timely appeal.[7]

## II.     Discussion

The District Court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291.

### A.     Evidentiary Ruling

PHA first takes issue with the District Court's admission of DiGravio's testimony, as corroborated by Gerald Paladino, that DiGravio's immediate supervisor, Nicholas DiPiero, "was constantly stating that . . . there would be repercussions" against "any supervisor [or] management level [employee] that testified against [PHA]" in the period prior to the *Paladino* trial. App. at 361. As noted above, DiPiero took the stand in rebuttal and denied ever making any such remarks to DiGravio.

---

[7]Marra and DiGravio have not appealed the District Court's entry of judgment in favor of PHA on their § 1983 claims.

Prior to trial, PHA had moved *in limine* to preclude admission of DiPiero's alleged out-of-court statement to DiGravio on hearsay grounds. In denying the motion, the District Court concluded that DiPiero's statement was admissible against PHA pursuant to Federal Rule of Evidence 801(d)(2)(D), which defines as nonhearsay a statement by a party's agent concerning a matter within the scope of the agent's employment.[8] The District Court concluded that DiPiero, whose supervisory powers included formally evaluating the performance of his subordinates and recommending discipline if necessary, was authorized to speak to DiGravio about the prospect of PHA employees facing "repercussions" for testifying against their employer at the impending *Paladino* trial.

On appeal, PHA insists that DiPiero's pretrial statement to DiGravio concerned matters beyond the scope of his employment with PHA, and hence was inadmissible under Rule 801(d)(2)(D), because the uncontested evidence shows that DiPiero had no involvement in the adverse employment actions taken against DiGravio and Marra after they testified in *Paladino*. We review a district court's decision to admit or exclude evidence for abuse of discretion, although our review is

---

[8]Rule 801(d)(2)(D) provides as follows: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D).

19

plenary as to the district court's interpretation of the Federal Rules of Evidence. *Renda v. King*, 347 F.3d 550, 553 (3d Cir. 2003) (citing *United States v. Saada*, 212 F.3d 210, 220 (3d Cir. 2000)).

In our view, PHA's argument rests on the mistaken premise that personal involvement in the employment decision being litigated is an absolute prerequisite to the admission of a statement by an employee against his employer under Rule 801(d)(2)(D). Although "[b]eing a direct decision-maker, of course, constitutes strong proof that a statement was made within the scope of employment, . . . the 'scope of employment' criterion [of Rule 801(d)(2)(D)] extends beyond direct decision-makers," *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003), as we ourselves recognized in *Abrams v. Lightolier Inc.*, 50 F.3d 1204 (3d Cir. 1995), one of the cases on which the District Court relied in rejecting PHA's hearsay objection. *See also Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998) (expressing reluctance to "read into [Rule 801(d)(2)(D)] a generalized 'personal involvement' requirement, especially in light of the Advisory Committee's admonition that '[t]he freedom which admissions have enjoyed . . . from the restrictive influences of . . . the rule requiring firsthand knowledge . . . calls for generous treatment of this avenue of admissibility'") (quoting Fed. R. Evid. 801 advisory committee's note 2).

In *Abrams*, an age discrimination case, the employer challenged the district court's admission of the testimony of

20

Hinsch, one of the plaintiff's former co-workers, that Hinsch's supervisor, Pedder, told him on several occasions that the company "frowned on" older employees. *Abrams*, 50 F.3d at 1215. Although neither Hinsch nor Pedder had any involvement in the company's decision to terminate the plaintiff, Pedder was authorized to discuss the company's employment policies with Hinsch. *Id.* Because Pedder's statement of "his opinion regarding company policy" concerned a matter within the scope of his authority, we concluded that the district court properly admitted the statement against the employer as nonhearsay under Rule 801(d)(2)(D). *Id.* at 1216. We stated that "[w]here a supervisor is authorized to speak with subordinates about the employer's employment practices, a subordinate's account of an explanation of the supervisor's understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer," regardless whether the declarant has any involvement in the challenged employment action. *Id.*; *see Hybert v. Hearst Corp.*, 900 F.2d 1050, 1053 (7th Cir. 1990) ("[D]irect warnings by [plaintiff's immediate supervisor], himself a member of management, given to [the plaintiff], his subordinate, as to the attitude, intentions and/or policy of the higher-ups in management" are admissible under Rule 801(d)(2)(D), even though the supervisor was not involved in challenged employment decision); *cf. Carter*, 349 F.3d at 274-76 (statements by vice provost that university's decisionmakers were "a bunch of racists" and "trying to get rid of black professors" held to be admissible under Rule 801(d)(2)(D) in

21

race discrimination action, where vice provost had no involvement in university's decision not to renew professor's employment contract but was responsible for overseeing university's affirmative action process).

Here, DiPiero conveyed to DiGravio his understanding of PHA's attitude toward employees giving adverse testimony, repeatedly commenting in the most general terms that there would be unspecified "repercussions" against "any supervisor" or "management level" employee, which would encompass even DiPiero's own superiors, Marra included, testifying for the plaintiffs at the *Paladino* trial. There is no question that DiPiero, in his capacity as DiGravio's immediate supervisor, was authorized to speak with DiGravio about his perception of PHA's disciplinary practices, formal or otherwise, and thus his opinion that those employees who testified adversely to PHA would face "repercussions" concerned a matter within the scope of his employment.[9] While the jury was certainly free to consider DiPiero's non-involvement in the challenged employment decisions in determining how much weight to give his remarks (if credited), his lack of participation in these decisions did not render his "opinion regarding company policy"

[9]We note that establishing the source of DiPiero's knowledge was not a necessary predicate to the admission of his remarks under Rule 801(d)(2)(D). *See Lexington Ins. Co. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 331 n.7 (3d Cir. 2005) (personal knowledge requirement does not apply to party admissions).

beyond the purview of Rule 801(d)(2)(D). *Abrams*, 50 F.3d at 1216. The District Court properly concluded that DiPiero's statement was not hearsay.

PHA also argued before the District Court that DiPiero's statement was inadmissible under Federal Rule of Evidence 403.[10] PHA does not directly raise a Rule 403 challenge before us, but instead contends, presuming success on its hearsay challenge, that it was unduly prejudiced by admission of DiPiero's statement such that the District Court's hearsay ruling cannot be treated as harmless error. To the extent that PHA's harmless error argument can be fairly recast as a legal challenge to the District Court's Rule 403 ruling, we conclude that the District Court acted well within its discretion in admitting DiPiero's statement under Rule 403.

In its Rule 403 balancing analysis, the District Court believed that DiPiero's statement bore "substantial probative value" in view of its close temporal proximity to the adverse action taken against DiGravio. App. at 162. On the other hand, admission of the statement would minimally prejudice PHA, the District Court reasoned, in part because DiPiero would be

---

[10]Under this Rule, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

available to explain or deny it. On appeal, PHA does not strongly contest the probative value of DiPiero's statement, even conceding (albeit incorrectly) that the statement is the "only" evidence of retaliation in the record. Appellants' Br. at 63. While the relevancy of DiPiero's statement is somewhat diminished by the fact that he had no involvement in the employment decisions at issue here, we agree with the District Court that his statement, given its timeliness and repeated utterance, would serve (if credited) as an important piece of circumstantial evidence supporting plaintiffs' retaliation claims. *See Hybert*, 900 F.2d at 1053 (statements by immediate supervisor reflecting attitude of decisionmaking superiors toward older employees "likely had a great impact on the jury" in age discrimination case); *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) (remarks by non-decisionmakers can still be evidence of atmosphere in which employment decision was carried out, which "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive") (quoting *Antol v. Perry*, 82 F.3d 1291, 1302 (3d Cir. 1996)); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 922-23 (3d Cir. 1997) (same). We also perceive no real danger of unfair prejudice in admitting DiPiero's statement.

In short, we cannot say that the District Court acted irrationally or arbitrarily in admitting DiPiero's statement over PHA's Rule 403 objection. *See Diehl v. Blaw-Knox*, 360 F.3d 426, 430 (3d Cir. 2004) (district court's explicit balancing

24

analysis under Rule 403 should not be disturbed unless "irrational or arbitrary") (citing *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 525 (3d Cir. 2003)).

## B. Sufficiency of the Evidence

Having satisfied ourselves that the District Court did not abuse its discretion in admitting DiPiero's statement, we turn to PHA's contention that the evidence is insufficient to support the jury verdicts in favor of Marra and DiGravio on their retaliation claims under the PHRA. Our review of the District Court's denial of PHA's motion for judgment as a matter of law is plenary, and we apply the same standard as did the District Court. *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006) (citing *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003)). Entry of judgment as a matter of law is a "sparingly" invoked remedy, *CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004), "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007) (quoting *Lightning Tube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). In performing this narrow inquiry, we must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury. *Lightning Tube*, 4 F.3d at 1166.

25

Section 955(d) of the PHRA forbids an employer to discriminate against an employee because that "individual has . . . testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 Pa. Cons. Stat. Ann. § 955(d). Plaintiffs' retaliation claims proceeded under a "pretext" theory of retaliation at trial, which is governed by the three-step burden shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (noting that "retaliation claims under . . . the PHRA typically proceed under the *McDonnell Douglas* framework") (citing *Fogleman v. Mercy Hosp. Inc*., 283 F.3d 561, 567-68 (3d Cir. 2002)); *Woodson,* 109 F.3d at 920 ("The allocation of the burden of proof for both . . . federal and state retaliation claims [under the PHRA] follows the familiar Title VII standards") (citations omitted).

Under the *McDonnell Douglas* paradigm, the employee bears the initial burden of establishing a *prima facie* case of retaliation. *Woodson,* 109 F.3d at 920. He must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman*, 283 F.3d at 567-68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)). If the employee establishes a *prima facie* case of retaliation, the burden of production shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment

26

action. *Woodson*, 109 F.3d at 920 n. 2 (citing *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 241, 252-55 (1981); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)). If the employer meets its burden, the burden of production returns to the employee, who must now show, by a preponderance of the evidence, that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) (quoting *Krouse*, 126 F.3d at 500-01).[11]

PHA does not dispute that Marra and DiGravio each presented sufficient evidence to establish two of the three elements of their *prima facie* cases: both engaged in a protected activity under the PHRA (giving sworn testimony at the *Paladino* trial) and PHA subsequently took adverse action against them (laying off Marra and transferring DiGravio to the Section 8 Department to perform inspections).[12] PHA instead

---

[11]Of course, the burden of persuading the trier of fact that the defendant intentionally retaliated against the plaintiff remains at all times with the plaintiff. *Woodson*, 109 F.3d at 920 n.2.

[12]The parties quarrel over the proper characterization of the employment decisions affecting Marra and DiGravio. PHA insists that Marra was "laid off," while plaintiffs counter that he was "terminated." PHA maintains that DiGravio was "loaned" to the Section 8 Department, while plaintiffs claim that he was "transferred." Although we recognize that these phrases may

27

contends that there is insufficient evidence from which a reasonable jury could find the requisite causal connection between the protected activity and adverse action in each case. Even if there is sufficient evidence of a causal link, PHA insists that it is still entitled to judgment as a matter of law because neither DiGravio nor Marra demonstrated that PHA's proffered non-retaliatory explanations for taking the adverse actions in question were pretextual in nature. We address each contention in turn.[13]

_____

well be terms of art with independent significance under PHA's employment policies, we need not resolve the parties' disagreement because it has no bearing on our analysis here. For purposes of our discussion, we use the terms interchangeably.

[13]We recognize that once a case has been tried to a jury on its merits, it is unnecessary for an appellate court to decide whether a plaintiff established a *prima facie* case of retaliation. *See Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 764 (3d Cir. 1989) ("Where the defendant has done everything that would be required of him if the plaintiff had made out a prima facie case, whether the plaintiff really did so is no longer relevant.") (quoting *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). Our inquiry is not whether the plaintiff has introduced sufficient evidence to establish a *prima facie* case of retaliation, but whether there is sufficient evidence to support the ultimate conclusion that the challenged employment decision was retaliatory in nature. Subsumed in this inquiry, of course, is consideration of whether there is a sufficient causal

### 1. Causal Connection Between Protected

connection between the protected activity and adverse action, meaning any difference in our analysis at this stage is probably more semantic than substantive. *See id.* at 764 n.2 ("Although we do not address this contention in terms of the *prima facie* case, it may be that our inquiry into the sufficiency of the evidence to support . . . an inference [of discrimination] will not differ markedly from an inquiry into whether the plaintiff has introduced evidence sufficient to establish one of the elements essential to her *prima facie* case.") (citations omitted); *Woodson*, 109 F.3d at 920-24 (post-verdict consideration of causal connection element); *cf. Watson v. Southeastern Pa. Transp. Auth.*, 207 F.3d 207, 221 (3d Cir. 2000) (noting that court is permitted to instruct jury that it may consider whether the "factual predicates necessary to establish the prima facie case have been shown").

We also acknowledge the close similarity between the causation analyses at stage one (*prima facie* case) and stage three (pretext) of the *McDonnell Douglas* framework, *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) ("The question: 'Did her firing result from her rejection of his advance?' is not easily distinguishable from the question: 'Was the explanation given for her firing the real reason?'"), and that much of the same evidence may be relevant to both inquiries, *id.*, but find it instructive to address them separately below in examining whether there is sufficient evidence to support the jury's findings of unlawful retaliation. "After all, if there was not a causal relationship[,] then the [defendant] could not have engaged in its conduct in retaliation for [plaintiffs] having engaged in a protected activity." *Lauren W. ex. rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

29

**Activity and Adverse Action**

We have recognized that a plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between his protected activity and the adverse action taken against him. *Farrell*, 206 F.3d at 284. In certain narrow circumstances, an "unusually suggestive" proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997); *see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (discharge of plaintiff two days after filing EEOC complaint found to be sufficient, under the circumstances, to establish causation). Conversely, however, "[t]he mere passage of time is not legally conclusive proof against retaliation." *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993) (citation omitted); *see also Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."). Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, *see, e.g.*, *Woodson*, 109 F.3d at 921 (finding sufficient causal connection based on "pattern of antagonism" during intervening two-year

30

period between protected activity and adverse action), or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole. *Farrell*, 206 F.3d at 280-81. In assessing causation, we are mindful of the procedural posture of the case, *see id.* at 279 n.5 ("There is . . . a difference between a plaintiff relying upon temporal proximity to satisfy her prima facie case for the purpose of summary judgment, and to reverse a verdict.") (internal citation omitted), and where, as here, the retaliation claim has been tried to a verdict, we give deference to the jury's "'unique opportunity to judge the credibility and demeanor' of the witnesses who testified at the trial . . . ." *Woodson*, 109 F.3d at 921 (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 502 (3d Cir. 1991)).

### a. Marra

Although the District Court found that the nine-month time lapse between Marra testifying at the *Paladino* trial in June 2001 and his eventual termination in March 2002 was not "unusually suggestive" of a retaliatory motive by PHA, it believed that the evidence presented at trial established an intervening pattern of antagonism against Marra sufficient to support an inference of causation. This pattern included: (1) the "vandaliz[ation]" of Marra's computer in July 2001, shortly after he testified at the *Paladino* trial, in response to which PHA "took no action"; (2) Marra's exclusion from the July 2001

31

meeting at which the Section 8 project was discussed; (3) the reassignment of DiGravio to the Section 8 Department, over Marra's objections, in July 2001; and (4) the "look of disgust" that Greene gave Marra upon learning, shortly after the *Paladino* trial, that Marra had testified against PHA. *Marra*, 404 F. Supp. 2d at 845. The District Court also believed that the involuntary demotion Marra received shortly after giving deposition testimony in *Paladino* indicated a causal connection between his subsequent trial testimony and termination. *Id.*

PHA's contentions predictably focus on the District Court's finding of an intervening pattern of antagonism against Marra.[14] Before considering PHA's specific arguments, we emphasize that it matters not, of course, whether each piece of evidence of antagonistic conduct is alone sufficient to support an inference of causation, so long as the evidence permits such an inference when considered collectively. *Woodson*, 109 F.3d at 921. "Thus, while we will discuss each piece of evidence, and [PHA's] objections to them, in turn, we must determine whether the evidence is sufficient based on the whole picture." *Id.*; *cf. Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and

---

[14]Even Marra does not quarrel with the District Court's determination that the nine-month gap between his testimony in *Paladino* and subsequent termination is not unusually suggestive standing alone, as this finding is undoubtedly correct.

similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

PHA first disputes that the computer failure Marra experienced shortly after he testified at the *Paladino* trial is suggestive of retaliatory animus, emphasizing the absence of any direct proof that his computer had been tampered with by a PHA employee. Given that this incident occurred on the heels of the jury's verdict in *Paladino* and while Marra was away from the office on vacation, however, we believe the jury here was permitted to infer that the extensive damage to Marra's computer - in his words, the hard drive was "totally wiped out" - resulted from foul play, a finding that was in no way precluded by the vague representation of a PHA employee that the computer had "burned out." Marra's testimony that PHA failed adequately to investigate the origin of his computer problems, which he promptly brought to Panchwagh's attention, also indicates causation because it suggests that PHA condoned such conduct. Further, although the culprit was never identified (or at least never revealed to Marra), the jury could also readily infer from these circumstances that a PHA employee, rather than some workplace intruder, was responsible for the vandalization. While this incident, standing alone, would typically be insufficient to support an inference of causation, we conclude that the jury could properly treat it as a link in the causal chain. *See Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006) (damage to plaintiff's vehicle by unknown vandals was a "component[] of an integrated pattern of retaliation" by employer).

33

Notwithstanding PHA's arguments to the contrary, we also believe that Panchwagh's decision to reassign DiGravio to the Section 8 Department, over Marra's objections, fortifies the causal link in Marra's case. PHA points out that Marra himself believed that DiGravio's transfer was simply the product of a "miscommunication" between DiGravio and Panchwagh, whom Marra considered to be an "honest and honorable man." App. at 275, 282. There is, however, ample evidence from which the jury could reasonably infer that, unbeknownst to Marra, Panchwagh was plotting against him. Although Marra stressed to Panchwagh his pressing need for DiGravio's assistance on a variety of ongoing projects, Panchwagh declined to recall DiGravio from the Section 8 Department (even though he had the authority to do so), and gave Marra the misimpression that DiGravio would only be unavailable for a few weeks. The jury also may have been skeptical of Panchwagh himself making the decision to send DiGravio to the Section 8 Department to work as an inspector, given his candid admission that, in all other instances, Marra decided which Inspections Division employees to reassign "because [Marra] was in charge of the Inspection[s] Division," App. at 472, and that "[t]ransferring a certain inspector or not transferring a certain inspector was left to [him] . . . . I was not running the day-to-day affairs of th[at] d[ivision]." App. at 586. The jury could have drawn many different inferences from Panchwagh's decision, one of which was that Panchwagh had reassigned DiGravio to the Section 8 Department, and declined to recall him, in the face of Marra's pleas, at least in part to deprive Marra of the much needed

34

services of a key subordinate, which undoubtedly contributes to an intervening pattern of antagonism against Marra.   As discussed more fully below in our pretext analysis, another inference the jury could have drawn was that Panchwagh reassigned DiGravio to the Section 8 Department because of his participation in the *Paladino* trial.   Panchwagh's retaliatory antipathy toward DiGravio helps build Marra's causation case because it suggests a hostile atmosphere in which the subsequent decision to terminate Marra was carried out. *See Walden*, 126 F.3d 506 at 521; *Woodson*, 109 F.3d at 922-23.

While PHA does not appear to challenge specifically the District Court's conclusion that Marra's exclusion from the July 2001 supervisors' meeting suggested a causal link, we observe that this finding is also supported by the evidence when viewed in the light most favorable to Marra.   Given Panchwagh's concession noted above that Marra was chiefly responsible for the assignment and allocation of labor to the Section 8 project, a reasonable juror could find it suspicious that Panchwagh convened a meeting of the Inspections Division's supervisory personnel, save Marra, to discuss that logistical task.   Similarly, although PHA does not appear to take issue with the District Court's reliance on the "look of disgust" Greene gave Marra upon learning that he had testified at the *Paladino* trial, this evidence also bears at least some probative value in assessing causation. While Greene had no personal involvement in the decision to terminate Marra, as the jury found, the jury still likely gave careful consideration to the expressive conduct of

35

PHA's highest ranking official, and could have reasonably concluded that Greene's negative reaction upon confirming Marra's involvement in the *Paladino* trial reflected an atmosphere in which the employment decision about Marra was made. *See Walden*, 126 F.3d 506 at 521; *Woodson*, 109 F.3d at 922-23.

Viewed in the light most favorable to Marra, the evidence we have discussed to this point shows that, in the months immediately following his participation in the *Paladino* trial, he had his computer vandalized, resulting in loss of significant work product; although he brought the computer incident to Panchwagh's attention, it was never adequately investigated; Panchwagh subsequently excluded Marra from an important meeting concerning matters within his province and reassigned one of his key subordinates, who had also testified against PHA in *Paladino*, to another Department, despite Marra's protestations; and PHA's top official gave Marra a look of disgust upon learning that he had testified at the *Paladino* trial. We have little doubt that this evidence considered as a whole, together with evidence of the involuntary demotion Marra had received after giving deposition testimony in *Paladino* approximately one year earlier,[15] is sufficient to forge a causal

---

[15]In a footnote, PHA contends that Marra's involuntary demotion after giving deposition testimony in *Paladino* constitutes a discrete allegation of retaliation for which Marra failed to exhaust his administrative remedies, and thus should

36

link between Marra testifying at the *Paladino* trial in June 2001 and his formal termination in March 2002.

In our view, however, the jury was permitted to consider this evidence within a more limited time frame than the nine-month gap that separated Marra's participation in the *Paladino* trial and his official last day as a PHA employee. Although Marra was not formally terminated until March 2002, the evidence shows that Panchwagh and Galbreth discussed eliminating Marra's position as early as fall 2001 and Panchwagh first recommended such action to Leithead in a November 2001 memorandum, and that Leithead approved Panchwagh's initial proposal but had him submit it to the Human Resources Department for review. In a follow-up

_____

not be considered. We disagree. Even assuming for the sake of argument that PHA is correct on the exhaustion issue, evidence of PHA's past response to Marra engaging in the same protected activity remains relevant to his exhausted retaliation claim and was properly admitted here. *See, e.g.*, *Abrams*, 50 F.3d at 1214-15 (evidence of employer's past treatment of plaintiff and others similarly situated, including incidents that are remote in time from the decision at issue, may indicate company's discriminatory attitude and the atmosphere in which subsequent employment decision was made); *see generally Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (authorizing use of prior, discrete acts of discrimination or retaliation that plaintiff failed to exhaust as background evidence in support of exhausted claims).

37

memorandum to Leithead in early December 2001, Panchwagh attached a lay-off notice for Marra.

As plaintiffs' counsel strenuously argued at trial, *see* App. at 185, 755, 759, 778, consistent with our "highly context-specific" approach to assessing causation, *Kachmar*, 109 F.3d at 178, the jury could reasonably infer from this evidence that PHA resolved to terminate Marra by no later than November 2001, only five months after he testified at the *Paladino* trial, rather than several months later when the adverse employment decision was formally carried out. *See id.* (although employee was not officially terminated until January 1994, "[h]er allegation that she was told her position had been offered to a male in November, 1993 . . . would, if proven, show that [defendant] had resolved to discharge her shortly after the latest [protected] activity" in mid-1993); *see also Hill v. City of Scranton*, 411 F.3d 118, 133 (3d Cir. 2005) (considering, as part of temporal proximity analysis in First Amendment retaliation case, fact that discharged employee's pre-termination hearing was initially scheduled for date three months earlier). Considering the pattern of antagonistic behavior against Marra within this more suggestive time frame, we conclude that the evidence as a whole is clearly sufficient to support a causal link between Marra's participation in the *Paladino* trial and his subsequent termination, "particularly when we consider, as we must, that the verdict may have been based in part on the jurors' evaluation of each witness' credibility and demeanor."

*Woodson*, 109 F.3d at 924.[16]

### b.    DiGravio

Although the District Court did not specifically address PHA's causation challenge with respect to DiGravio, which is confined to a footnote in both its post-trial and appellate briefs, this issue need only detain us briefly.   PHA's sole argument is that DiGravio's offer to work in the Section 8 Department undercuts any causal connection between his participation in the *Paladino* trial and his subsequent transfer to that Department. This contention is better understood as a pretext challenge and will be fully addressed in that analysis below.  Suffice it to say that the jury could have reasonably inferred the requisite causal connection based on the close temporal proximity between DiGravio testifying at the *Paladino* trial and his transfer to the Section 8 Department approximately six weeks later, coupled with the antagonism experienced by Marra, a fellow witness, in the weeks that immediately followed the trial. *See Farrell*, 206 F.3d at 281 (noting that employer's conduct toward others is

---

[16]We hasten to add that our causation analysis should not be understood as an exclusive catalogue of the record evidence bearing on this issue.  Rather, because we conclude that the evidence cited above is sufficient to establish a pattern of antagonistic behavior linking Marra's involvement in the *Paladino* trial and his subsequent discharge, we simply need not look beyond this pattern for other circumstantial evidence supporting a causal link.

relevant to causation inquiry).

## 2. Pretext

The remaining question is whether sufficient evidence exists from which the jury could find by a preponderance of the evidence that PHA's explanations offered for its adverse employment decisions were merely a pretext for unlawful retaliation. Pretext may be shown by exposing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Krouse*, 126 F.3d at 504 (quoting *Fuentes*, 32 F.3d at 765)). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated]." *Fasold*, 409 F.3d at 185 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (alteration added)); *see also Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1065-72 (3d Cir. 1996) (en banc). As the Supreme Court recognized in *Reeves*:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle

40

of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.' Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147 (internal citations omitted).

There is ample evidence from which the jury could have inferred that PHA's explanation for terminating Marra (his position was eliminated as part of a reorganization) was not credible. First, the jury could have reasonably believed that the sequence of events leading up to, and the timing of, Marra's termination cast doubt on the legitimacy of PHA's asserted justification. After twice recommending the elimination of four inspector positions, in addition to Marra's position, over the course of a three-week period in late 2001, Panchwagh significantly changed course in his final memorandum to Leithead, now targeting Marra's position alone. While his previous recommendations had languished for several months without final action, Panchwagh's scaled-back recommendation was approved and executed within a span of merely three days. Conspicuously absent from Panchwagh's final memorandum was any explanation for why he believed that each position he previously proposed eliminating, save Marra's, should now be

41

spared that fate. Although Galbreth insisted at trial that it became unnecessary to lay off anyone other than Marra because of the retirement or transfer of the inspectors in question, this explanation only covered three of the four inspector positions that had been recommended for elimination. Neither Galbreth nor Panchwagh, nor any other PHA witness, provided an explanation for the decision not to eliminate the fourth inspector position, which may have raised further doubts in the jurors' minds about the true scope and intent of the PHA's purported reorganization plan. Moreover, given that PHA opted not to terminate two of the inspectors who would have been affected by the reorganization because they were planning to retire in the near future, a reasonable juror could easily attach significance to the fact that Panchwagh, himself on the verge of retiring, did not at least ask Marra, who was 68 years old at the time, about his retirement plans before terminating his employment.

Second, the jury could have reasonably believed that the rationale underlying Panchwagh's recommendation to eliminate Marra's position as part of the reorganization - lack of available work - was highly suspect. Contrary to Panchwagh's suggestion, Marra testified that he was continuously busy throughout the relevant time period, citing several different projects on which he was actively working. Indeed, Panchwagh's representation that there was insufficient work available for Marra came only a few months after Marra had complained to Panchwagh about DiGravio's transfer to the Section 8 Department, stressing his dire need for DiGravio's

42

continued assistance in handling the crush of work in the Inspections Division.

Third, we observe that, in contrast to many employment cases in which an employer successfully defends its actions as being part of a company reorganization or the like, none of Marra's co-workers who were affected by the reorganization at PHA suffered the same fate as he did - loss of employment. *See, e.g.*, *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006) (finding that terminated employee failed to rebut employer's reorganization explanation, which was supported in part by evidence that several other positions had been eliminated); *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 785 (7th Cir. 2004) ("[W]e think it ridiculous to suggest that Con-Way would terminate nine other employees from Davis's facility, not to mention forty others from around the state . . ., on the pretense of economic hardship, just so it could cover its tracks with respect to Davis."). To the contrary, the uncontested evidence shows that remaining employees affected by the reorganization, many of whom held the same position as Marra in different departments and divisions, were simply transferred to new positions within PHA. This disparate treatment, when considered in conjunction with the evidence recited above, further strengthens the inference that PHA's proffered explanation was pretextual. *See Butler v. City of Prairie Village*, 172 F.3d 736, 752 (10th Cir. 1999) (finding genuine issue of material fact regarding whether employer's reorganization explanation was pretextual in part because

43

plaintiff's position was only one eliminated).

Contrary to PHA's assertion, we do not think that Marra's admission, when questioned on cross-examination, that he did not believe Panchwagh retaliated against him undercuts a finding of pretext here. Marra's testimony was colored by his belief, based on Panchwagh's own representations to him, that Panchwagh was equally in the dark about the reorganization. But in fact, over the course of several months leading up to his termination, Panchwagh had consistently recommended the elimination of Marra's position as part of a "reorganization" of the Inspections Division. While Panchwagh may have left Marra in the dark, his pivotal role in the plan to eliminate Marra's position was exposed in full light to the jury.

There is also no shortage of evidence from which a reasonable factfinder could have chosen to disbelieve PHA's reasons offered for reassigning DiGravio to the Section 8 Department to perform inspections work (his volunteering to assist a Department in need of help). PHA makes much of DiGravio's testimony that he elected to "go" to the Section 8 Department because he "figured it would only be another feather in [his] cap." In making this statement, however, DiGravio reasonably believed, based on Panchwagh's representations to him, that he would retain a supervisory role while working in that Department. Instead, Panchwagh reassigned DiGravio with knowledge that he would be stripped of his supervisory status and left to perform the grueling inspections work himself,

44

toiling in conditions that were by all accounts little short of deplorable.

Any notion that the transfer resulted from an innocent miscommunication is belied by DiGravio's confrontation of Panchwagh shortly after learning that he would be performing inspections work in Section 8. When pressed by DiGravio to explain his apparent demotion, Panchwagh pleaded ignorance, much as he did with Marra, claiming that he served as nothing more than the messenger for a decision that came from above. In reality, as Panchwagh conceded at trial, he alone made the decision to transfer DiGravio to the Section 8 Department. Panchwagh also admitted that DiGravio was the only supervisory level employee in the Inspections Division ever sent to the Section 8 Department to perform inspections, and that, even though he assured DiGravio that his Section 8 assignment would be quite short (Galbreth herself was under the impression that DiGravio's stint in the Section 8 Department would last no more than one month), Panchwagh never sought to recall DiGravio prior to his (Panchwagh's) retirement nearly eight months later. While Panchwagh insisted that he had "no reason" to recall DiGravio based on the ongoing needs of the Section 8 Department, the jury was free to reject Panchwagh's testimony and infer a motive less benign based on the evidence.

While we think a reasonable factfinder could conclude that PHA intentionally retaliated against Marra and DiGravio based on the causation evidence discussed above, coupled with

45

the evidence exposing the falsity of PHA's asserted justifications for its actions, *Reeves*, 530 U.S. at 147-48,[17] we need not rest our conclusion on this evidence alone. As noted, plaintiffs bolstered their claims by presenting additional, independent evidence of retaliatory animus - *e.g.*, DiPiero's repeated warnings to DiGravio that there would be "repercussions" against employees testifying against PHA - from which the jury could reasonably infer that PHA's decisionmakers, principally Panchwagh here, harbored ill-will toward Marra and DiGravio for the protected activity in which they engaged. In sum, viewed in the light most favorable to Marra and DiGravio, the evidence presented at trial is sufficient to sustain the retaliation verdicts returned by the jury in their favor under the PHRA.[18]

---

[17]In *Reeves*, the Supreme Court recognized "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory," such as where the record "conclusively revealed some other, nondiscriminatory reason for the employer's decision" or where "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." 530 U.S. at 148. This is not such a case.

[18] PHA also seeks a new trial on the ground that the PHRA verdicts were against the weight of the evidence. Unlike a sufficiency of the evidence claim, when a court evaluates a

46

### C. Consistency of the Verdicts

PHA also challenges the District Court's denial of its motion for judgment as a matter of law, or in the alternative a new trial, on the ground that the jury's finding that PHA retaliated against Marra and DiGravio, in violation of the PHRA, is irreconcilably inconsistent with its finding that Greene did not personally direct or acquiesce in any retaliation against them under § 1983.[19] Immediately after

---

challenge to the weight of the evidence it does not view the evidence in the light most favorable to the verdict winner, but instead exercises its own judgment in assessing the evidence. *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir. 1999); 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2806 (2d ed. 1995). "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991). Based on our careful review of the record, we see no basis for granting this extraordinary relief.

[19]The verdict form, with the jury's responses denoted by an "X," provided in its entirety as follows:

1. Do you find by a preponderance of the evidence that the Philadelphia Housing Authority retaliated against Edward Marra in violation of the Pennsylvania Human Relations Act?

47

Yes   _X_             No   ___

2.     Do you find by a preponderance of the evidence that the Philadelphia Housing Authority retaliated against Albert DiGravio in violation of the Pennsylvania Human Relations Act?
Yes   _X_             No   ___

3.     Do you find by a preponderance of the evidence that Edward Marra was retaliated against in violation of Section 1983?
Yes   _X_             No   ___

(Answer Question #4 only if you answered "Yes" to Question #3)

4.     Do you find by a preponderance of the evidence that Carl Greene personally ordered or acquiesced in the retaliation, if any, against Edward Marra?
Yes   ___             No   _X_

5.     Do you find by a preponderance of the evidence that Albert DiGravio was retaliated against in violation of Section 1983?
Yes   _X_             No   ___

(Answer Question #6 only if you answered "Yes" to Question #5)

6.     Do you find by a preponderance of the evidence that Carl Greene personally ordered or acquiesced in the retaliation, if any, against Albert DiGravio?

48

discharging the jury, the District Court entered judgment in favor of both Marra and DiGravio on their PHRA claims. The District Court entered judgment in favor of PHA on the § 1983 claims, however, notwithstanding the jury's findings that PHA retaliated against both Marra and DiGravio "in violation of" that statute, based on the jury's separate finding that Greene – the only employee whose conduct could, as a matter of law, be imputed to PHA for purposes of § 1983 liability under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), and its progeny – did not personally order or acquiesce in the retaliation. *See generally, id.* at 694 (municipal liability under § 1983 only attaches when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury"). Because the PHRA subjects employers to a broader

---

Yes      No   X

7. If you answered "Yes" to Question #1 or (3 and 4), what amount of damages, if any, do you award Edward Marra?
Back Pay:      $208,676
Compensatory:      $102,000

8. If you answered "Yes" to Question #2 or (5 and 6), what amount of damages, if any, do you award Albert DiGravio?
Compensatory:      $70,000

App. at 4-5.

49

scope of liability under principles of *respondeat superior*, *see generally County of Allegheny v. Wilcox*, 465 A.2d 47 (Pa. Commw. Ct. 1983), as neither party disputes, the District Court rejected PHA's contention, first raised in post-trial motions filed several days later, that the jury's PHRA verdicts in favor of Marra and DiGravio were inconsistent with its absolution of Greene. The District Court concluded that, under the theory of *respondeat superior*, there was sufficient evidence from which the jury could conclude that a PHA employee other than Greene, the obvious candidate being Panchwagh, retaliated against both Marra and DiGravio in violation of the PHRA.

On appeal, PHA does not seriously dispute that the challenged jury findings are facially consistent, nor could it, in light of the materially different standards of liability governing claims under § 1983 and the PHRA, upon which the jury was properly instructed. *See Kitchen v. Chippewa Valley Sch.*, 825 F.2d 1004, 1013-14 (6th Cir. 1987) ("By finding that Kitchen was denied equal protection, but not finding the board liable [under § 1983], the jury must have concluded that the causal nexus of board policy or custom was absent. The board's liability under Title VII, however, can be based on the theory of *respondeat superior*. Therefore, the district court could have found liability against the board under *respondeat superior*. Such a finding would not have conflicted with the jury's § 1983 finding.") (internal citation omitted); *see also Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1547 (10th Cir. 1993) (as a general matter, "[a] verdict that resolves separate and distinct

50

causes of action in favor of both parties is not inconsistent on its face") (citation omitted). The obvious inference from the jury's findings that PHA retaliated against both Marra and DiGravio, but Greene was not personally involved in either instance, is that the jury believed that one or more of PHA's other agents were responsible for the retaliation, as it was permitted to do in assessing PHRA liability under *respondeat superior*. As the District Court's analysis implies, any "inconsistency" between these findings can be exposed only by inquiring into whether there is sufficient evidence to support the conclusion that one or more PHA employees, other than Greene, retaliated against Marra and DiGravio. At bottom, rather than an inconsistency between the PHRA and § 1983 verdicts, what PHA asserts is an inconsistency between the jury's findings and the evidence, which amounts to nothing more than a recasting of the sufficiency of the evidence challenge that we have already considered and rejected.

PHA resists this conclusion by arguing that, regardless whether the evidence may be interpreted in such a manner as to support a finding of PHRA liability based on the conduct of some PHA employee other than Greene, Marra and DiGravio exclusively targeted Greene as the perpetrator of the retaliation at trial, and the jury disagreed. In essence, PHA urges us to construe the jury's PHRA verdicts as being "inconsistent" with the theory of the case advanced by Marra and DiGravio. Accepting this invitation would require us to conclude that plaintiffs' view of the adverse employment decisions against

51

them as being retaliatory in nature was contingent upon Greene's affirmative involvement in those decisions. No fair reading of the trial record supports PHA's assertion.[20] The

[20]In particular, we note that plaintiffs' counsel conducted a vigorous cross-examination of Panchwagh, consuming nearly eighty pages of transcript, in which she took pains to establish his knowledge of their involvement in the *Paladino* trial at the time he made the challenged employment decisions. She probed a variety of issues bearing on his retaliatory animus. These included the sequence of events leading up to Marra's termination as part of the purported reorganization, the nature and scope of the reorganization, Panchwagh's failure to include Marra in the July 2001 supervisors' meeting and consult him prior to transferring DiGravio to the Section 8 Department, Panchwagh's consideration of transferring other supervisors to the Section 8 Department to perform inspections, and his authority to recall DiGravio from the Section 8 Department. Moreover, on several occasions plaintiffs' counsel impeached Panchwagh with his prior deposition testimony. Naturally concerned about the impression this cross-examination may have left on the jury, defense counsel elicited testimony from PHA's subsequent witnesses that portrayed Panchwagh's conduct in a far more favorable light. *See* App. at 646 (defense counsel to Galbreth: "To your knowledge, did Ramesh Panchwagh take any action against Mr. DiGravio to punish him for his Federal Court testimony?"); App. at 691-92 (defense counsel to DiPiero: "Did Ramesh Panchwagh ever talk to you and suggest that, if Mr. DiGravio or anyone else testified against the PHA, that there would be repercussions with respect to their

52

essence of plaintiffs' claims is that the particular employment decisions affecting them were, without qualification, the product of retaliation for their involvement in the *Paladino* trial, rather than honest business considerations. From their perspective, the only question was how far up the chain of command the blame could be put for purposes of imputing liability to PHA, the only named defendant. To the extent that they more forcefully pointed at Greene as the orchestrator of the challenged employment decisions, it was primarily, if not exclusively, because they could not prevail against PHA under § 1983 without doing so.

PHA's contrary suggestion on appeal is belied by its own thinking at trial, as reflected in the jury instructions and verdict form upon which the parties agreed. At PHA's request, the District Court instructed the jury that it was required to return a verdict in favor of PHA on the § 1983 claims if it found that Greene had no involvement in the challenged employment decisions. PHA did not, however, request a similar instruction for the PHRA claims. Instead, without any objection by PHA, the District Court instructed the jury that, for purposes of PHRA

employment?"). Lest there be any lingering doubt in the jurors' minds that Panchwagh was among the culpable participants, plaintiffs' counsel again targeted him in her closing argument, remarking, for example, that "the trumped up reason [of DiGravio] volunteering was to try to avoid the claim that it was in retaliation . . . *[a]nd Mr. Panchwagh was in on that . . . .*" App. at 775 (emphasis added).

53

liability, "[i]t is undisputed in this case that *all acts done by officers and employees* of the [PHA] . . . were within the scope of *their* employment with the [PHA] . . . . Therefore, you must then decide the other questions [regarding liability], keeping in mind that it is undisputed that the acts were conducted, or . . . were done[,] within the scope of *their* employment," App. at 810 (emphasis added), authorizing the jury to look beyond Greene to the remaining PHA employees in assessing PHRA liability. Consistent with these instructions, the agreed-upon verdict form authorized the jury to award damages based on the single finding that PHA retaliated against Marra and DiGravio, respectively, in violation of the PHRA, whereas the jury was only permitted to enter a damages verdict on the § 1983 claims if it first found that Greene personally ordered or acquiesced in the retaliation against Marra and DiGravio, respectively. *See*, e.g., App. at 5 ("If you answered 'Yes' to Question #1 [whether PHA retaliated against Marra in violation of the PHRA] or (3 *and* 4) [whether Marra was retaliated against in violation of Section 1983 *and* Greene personally ordered or acquiesced in the retaliation], what amount of damages, if any, do you award Edward Marra?") (emphasis added). In rendering PHRA verdicts in favor of both Marra and DiGravio, the jury faithfully applied the instructions given to them.

In short, we reject every permutation of PHA's inconsistency challenge and conclude that the jury's findings

54

here are consistent in all respects.[21]

---

[21]The parties debate whether PHA waived its inconsistency challenge pursuant to Federal Rule of Civil Procedure 49, which addresses special verdicts and interrogatories, by failing to raise this issue before the District Court until after the jury had been discharged. Resolution of this issue may well turn on whether the verdicts here are properly characterized as special verdicts, governed by Rule 49(a), or general verdicts accompanied by interrogatories, governed by Rule 49(b). *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1056-57 (Becker, J., opinion announcing judgment of the court) (3d Cir. 1991) ("In this circuit, it probably is necessary, as it is in the majority of the circuits, to raise prior to the jury's dismissal an objection based on the inconsistency of the answers to interrogatories supporting a general verdict rendered under Rule 49(b). It is clear, however, that, in order to preserve the objection on appeal, it is not necessary in this circuit for a party, prior to the district court's dismissal of the jury, to lodge an inconsistency objection to special verdicts rendered under Rule 49(a).") (internal citations omitted); *see also Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 104 n.15 (3d Cir. 1993) (noting, without resolving the issue, that "[w]hile [Judge Becker's statement about Rule 49(b) waiver in *Simmons*] may well be correct, . . . it is, by its own language, a tentative conclusion . . . . [It] cannot, in any case, be considered a holding of the court . . . ."). As might well be gleaned from our analysis above, we think a strong case can be made that PHA waived its "inconsistency" challenge at an even earlier juncture, pursuant to Federal Rule of Civil Procedure 51, by failing to raise any objection to the content of the jury instructions and verdict form, both of which

## D.    Jury Trial

PHA finally contends that the District Court erred in permitting plaintiffs' PHRA claims to be tried before a jury. Although the Pennsylvania Supreme Court has construed Section 962(c)(3) of the PHRA[22] as not conferring a right to a jury trial for claims under the statute, *Wertz v. Chapman Twp.*,

---

authorized the jury to make the findings that PHA now complains are inconsistent. *See* Fed. R. Civ. P. 51 (addressing objections to jury instructions); *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 84-85 (2d Cir. 2006) ("Waiver of an objection to an inconsistent verdict has been found . . . when the inconsistency was caused by an improper jury instruction or verdict sheet and there was no objection to either the instruction or verdict sheet prior to submission of the case"); *Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 349 (2d Cir. 1999) (challenge to instructions provided on verdict form must comply with Rule 51).   In the end, however, we need not resolve the waiver issue under Rule 49 or 51 because the verdicts here are not inconsistent.

[22]"If the court finds that the respondent has engaged in or is engaging in an unlawful discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay, or any other legal or equitable relief as the court deems appropriate . . . ."   43 Pa. Cons. Stat. Ann. § 962(c)(3).

741 A.2d 1272 (Pa. 1999), the District Court concluded that it was not bound by *Wertz* because the right to a jury trial in federal court is a matter of federal law. The District Court further determined that Marra and DiGravio were entitled to a jury trial on their PHRA claims under the Seventh Amendment to the United States Constitution. On appeal, PHA takes issue only with the District Court's predicate determination that federal law, not state law, governs the question of whether a litigant has a right to jury trial on a claim brought in a federal forum, insisting that the District Court was bound to apply *Wertz* and strike the jury trial demand for the PHRA claims. We disagree.

"The right to a jury trial in federal court, regardless of whether the claim arises under state law, presents a question of federal law," *In re City of Philadelphia Litigation*, 158 F.3d 723, 726 (3d Cir. 1998) (citing *Simler v. Conner*, 372 U.S. 221, 222 (1963) (per curiam); *Cooper Labs., Inc. v. Int'l Surplus Lines Ins. Co.*, 802 F.2d 667, 671 (3d Cir. 1986)), "even when a state statute or state constitution would preclude a jury trial in state court." *Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 230 (8th Cir. 1996) (citations omitted). This long-recognized precept is dictated by the clear command of the Seventh Amendment. *See* U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."); *Simler*, 372 U.S. at 222 ("The federal policy favoring jury trials is of historic and continuing strength. Only through a holding that the jurytrial

57

[sic] right [in federal court] is to be determined according to federal law can the uniformity in its exercise[,] which is demanded by the Seventh Amendment[,] be achieved.") (internal citations and footnote omitted).[23]

Our decision in *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49 (3d Cir. 1989), relied on here by PHA, is not to the contrary. There, the plaintiff brought suit against her former employer for, among other things, gender discrimination in violation of Title VII and the PHRA. Both parties requested a jury trial and the case was tried to a jury. It found in favor of the plaintiff on both claims. It had not been instructed on the statutory caps on back pay under Title VII and the PHRA, however, and awarded back pay damages in excess of those caps. Reasoning from the premise that neither Title VII nor the PHRA conferred a right to a jury trial on the plaintiff's claims,[24] the district court elected to treat the jury's gender discrimination verdict as merely advisory in nature, even though the case had been submitted to the jury on the parties' understanding that the

---

[23]The Supreme Court has interpreted the Seventh Amendment to require a jury trial on the merits in actions that are analogous to "Suits at common law," including actions enforcing statutory rights. *Curtis v. Loether*, 415 U.S. 189, 192-94 (1974).

[24]Title VII was subsequently amended by the Civil Rights Act of 1991 to provide for jury trials in certain cases. *See* 42 U.S.C. § 1981a(c)(1).

jury verdict would be binding, and reduced the plaintiff's back pay award to comply with the statutory caps.

On appeal, the plaintiff did not challenge the district court's legal premise that she had no right to a jury trial on her claims, but instead principally contended that the court had violated Federal Rule of Civil Procedure 39(c)[25] by announcing that it would treat the jury's verdict as advisory only after the verdict had been returned. At the outset of our analysis of this claim on the merits, we observed that "neither Title VII nor PHRA provide for trial by jury as a matter of right," *Bereda*, 865 F.2d at 52, merely citing § 962(c) of the PHRA for the latter proposition, and did not consider whether the Seventh Amendment independently conferred such a right. We went on to rule in favor of the plaintiff on the merits of her Rule 39(c) argument. *Id.* at 53.

PHA misreads *Bereda* as eschewing application of a federal constitutional analysis in determining whether there exists a right to a jury trial in federal court on a state law claim. We were not asked in *Bereda* to determine whether the plaintiff had a federal constitutional right to a jury trial on her PHRA

_____

[25] "In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or . . . the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right." Fed. R. Civ. P. 39(c).

claim, and our cursory observation that there exists no statutory right to a jury trial under the PHRA, an issue that would not be definitively resolved by the Pennsylvania Supreme Court until more than a decade later in *Wertz*, was intended to serve as nothing more than an acknowledgment of an undisputed point in that case. In any event, long-standing Supreme Court precedent requires the application of federal law in determining the right to a jury trial in federal court, *Simler*, 372 U.S. at 222, and our decision in *Bereda* cannot, and should not, be understood to suggest anything to the contrary.

We thus conclude that the District Court was correct in looking beyond *Wertz* to determine, under the Seventh Amendment, whether Marra and DiGravio had a constitutionally guaranteed right to try their PHRA claims before a jury. We need not further decide whether the District Court correctly held that Marra and DiGravio were entitled to a jury trial on their PHRA claims under the Seventh Amendment, *see Tull v. United States*, 481 U.S. 412, 417-18 (1987) (articulating two-part test for determining whether statutory cause of action is a "Suit at common law" for Seventh Amendment purposes), as PHA has not challenged this aspect of the District Court's ruling.[26]

_____

[26]Without expressing any comment about the propriety of these rulings, we note that scores of district courts in this Circuit have concluded that the Seventh Amendment confers a right to a jury trial on PHRA claims brought in federal court, at least where compensatory relief is sought. *See, e.g.*, *Heater v. Kispeace*, No. Civ. A. 05-4545, 2005 WL 2456008, at *5 (E.D.

## III. Conclusion

For the foregoing reasons, we affirm the judgment in favor of Marra and DiGravio on their retaliation claims under the PHRA.

Pa. Oct. 5, 2005); *Grabosky v. Tammac Corp.*, 127 F. Supp. 2d 610, 624 (M.D. Pa. 2000); *Cortes v. R.I. Enterprises, Inc.*, 95 F. Supp. 2d 255, 260-62 (M.D. Pa. 2000); *Graham v. Toltzis Communications, Inc.*, No. Civ. A. 98-6269, 2000 WL 433978, at *1 (E.D. Pa. April 18, 2000); *Pellegrino v. McMillen Lumber Products Corp.*, 16 F. Supp. 2d 574, 591 (W.D. Pa. 1996); *Lubin v. Am. Packaging Corp.*, 760 F. Supp. 450, 453-55 (E.D. Pa. 1991).